STATE OF IOWA, v. R. L. DUNCAN, Appellant.

**Criminal law:** BURGLARY: EVIDENCE OF ACCOMPLICE: CORROBORATION.
1  The corroboration of the testimony of an accomplice required by the statute to sustain conviction must be by testimony independent of that which comes from the accomplice, and must tend to connect the accused with the commission of the offense. On this prosecution for burglary the evidence is held insufficient to corroborate the accomplice and to connect defendant with the commission of the crime.

Same.   The mere finding of a revolver taken from the burglarized
 2.  premises tended to show nothing more than that the premises
      had been broken into, and was insufficient for the purpose of cor-
      roborating the accomplice or connecting defendant with the com-
      mission of the crime.

*Appeal from Fremont District Court.*—HON. E. B. WOODRUFF,
Judge.

.TUESDAY, DECEMBER 10, 1912.

DEFENDANT was indicted, tried, and convicted of the
crime of breaking and entering in the daytime the passenger
depot of the Chicago, Burlington & Quincy Railroad Company
at the town of Hamburg, and appeals.—*Reversed.*

*Wm. Bammer* and *Wm. Eaton,* for appellant.

*George Cosson,* Attorney General, and *John Fletcher,* As-
sistant Attorney General, for the State.

DEEMER, J.—On the 5th day of March, 1911, the ticket
office located in the depot of the Chicago, Burlington & Quincy
Railroad Company at Hamburg was broken into while the
ticket agent was at dinner, and the money drawer was broken
open and $98.25 in money, taken therefrom.   One R. E.
Fowler, who was in the employ of the railway company as a
section hand, was arrested for the offense and confesses to
have had a part therein and at the trial of defendant, was
a witness for the state.   At that trial he testified that he and
defendant conspired to commit the offense, and selected Sun-
day as the day for the reason that there would then be more
money in the office because the ticket agent did not make any
bank deposits from Friday until the following Monday.   De-
fendant lived about one hundred feet just south of the depot,
and his wife conducted a restaurant in the property.   Fowler
testified that on the day of the breaking he went to defendant's

restaurant just before noon, and that defendant then said: "This is Sunday"; that the two men then watched until the ticket agent went to dinner, whereupon he (Fowler) went to the depot, taking with him a piece of wire for the purpose of opening the door of the ticket office, which he then did; that defendant stood guard upon the porch of his dwelling; and that when Fowler returned, after getting the money and also a revolver, the money was temporarily deposited in a cobhouse at Fowler's home, but that later the parties met on the Fowler premises and divided the money. Fowler said that defendant took the revolver and afterward hid it in the vault of an outhouse near the depot. The revolver was afterward found in this outhouse.

Fowler is a confessed accomplice, and the statute provides that "A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence which shall tend to connect the defendant with the

**1. CRIMINAL LAW: burglary: evidence of accomplice: corroboration.** commission of the offense and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Code, section 5489. This corroboration must be by testimony other than that which comes from the accomplice, and it must tend to connect defendant with the commission of the offense.

It is manifest that the finding of the revolver at the place where the accomplice, Fowler, said defendant put it, does not tend to corroborate the witness, for he may have put the revolver there himself and concocted the story about defendant's telling him that he (defendant) placed it there.

Fowler testified that defendant promised to watch for railway detectives who might appear, and, when a detective appeared the following Monday morning to investigate the matter, it is claimed that defendant watched him constantly, and that the two (Fowler and defendant) met during the afternoon at defendant's residence or near a coalhouse, and that defendant inquired of Fowler as to whether he had seen

the detectives, what they had said to him, or what he said to them. In fact, the only corroboration here comes from witness Seaman, a detective, and witness Arnold, the ticket agent. We here quote Arnold's testimony with reference to the matter:

Defendant has been around the depot there for years, thirty-five or forty, I should judge. He knows just how we handle the office there. Q. Were you at the depot when the train came from the South that afternoon at 4 o'clock? A. Yes, sir. Q. Do you know whether the defendant was there? A. Yes, sir. Q. Where was he about the premises? A. I think he was standing just about the corner of the baggage-room door. Q. Could the people who got off that train be seen from his place of residence? A. No, sir. Q. When was the next daylight train, the first daylight train after that that came into the station? A. Eight-thirty next morning, Monday morning. Q. From where did it come? A. From Red Oak. Q. What, if anything, did you observe Mr. Duncan do about coming to that train? A. He came over to that train in his shirt sleeves, went around the depot around by the baggageroom, and stood there when the train stopped. Q. What did you observe Mr. Duncan do after the train stopped? A. Well, he seen who got off and went back home. Q. Who did get off? A. Mr. Seaman. Q. Did you see him after he went back home? A. I noticed him—I seen him several times, standing in the door over there, looking at the depot. Q. Where was Mr. Seaman at that time? A. He was in the office talking to me about the case, about this robbery. Q. What did you observe Mr. Duncan do while Seaman was at the depot about standing near the door and looking across at the depot? A. Well, I noticed him standing at the door of the restaurant there looking toward the depot several times, and he looked over that way. Q. Did Mr. Seaman leave the depot and go uptown or away from the place? A. He went away from the depot. Q. What did you observe Mr. Duncan do about taking his place at the window or door looking across that way after Mr. Seaman returned to the depot? A. He did. He watched the depot very close. Q. Now, what did you observe? Had you seen Mr. Duncan about the trains before this Sunday afternoon? A. Not

around the passenger trains after that time. Q. Did you see him around the passenger trains after the 8 o'clock train in the morning, after Mr. Seaman got off? A. No, sir. Q. Do you remember seeing him some time right after noon on the porch of his restaurant there? A. Yes, sir. Q. Do you remember seeing Ed Fowler in that vicinity? A. Yes, sir. Q. What, if anything, did you observe the defendant do as to motioning or calling Mr. Fowler and Mr. Fowler going over there? A. Fowler started down the track and was walking along and I saw Bob motion for him to come back, and he went in the restaurant with Bob. Q. How long did he remain there? A. Well, I should say about fifteen or twenty minutes. Q. Now, did you see Mr. Fowler and the defendant after you came back to the depot—I mean after you got back to the depot after dinner on Sunday? A. I saw them together. I seen Fowler go back over to Duncan's about 1:15, just shortly after 1. I didn't see the two together that day.

The witness Seaman testified: "I am special agent for the Burlington road. My duties are to investigate claims and look after parties who commit thefts against the company. I have known the defendant about a year and a half. I learned of this robbery on Sunday and came from Red Oak to Hamburg about 8 o'clock on Monday morning. When I got off the train, Duncan was standing by baggageroom. He went from there over to Mrs. Duncan's boarding house. I went into the ticket office. I observed Duncan. I went into the depot at the east door. I don't know whether he saw me or not. I saw him standing on the porch over there and watching every move I was making. I went to St. Joe that evening on the 6 o'clock train."

This is all the corroborating testimony, and we think it insufficient to connect defendant with the crime. The witnesses all admit that defendant had met the trains at the depot frequently for many years, and there is nothing in the fact that he met the Monday morning trains, which under this record should be considered a circumstance against him. The only other testimony against him is that he watched the de-

tective while he was investigating the matter in the ticket
office, and that during the afternoon of the day the detective
was there defendant motioned to Fowler to come over to his
(defendant's) residence, which he (Fowler) did, remaining
there for some fifteen minutes.    The testimony shows that
defendant had heard of the breaking of the depot just
after it was committed, and, if he did, it was quite natural
for him to watch the movements of the detective.    That
he did watch him is not at all inconsistent with innocence.
That he should have called Fowler to his residence in plain
daylight, while the detective was in town, is not in any
manner indicative of guilt.    Arnold also testified that when
he got back to his office on Sunday he saw Fowler go over to
Duncan's place at the hour of about 1:15 p. m.    Remem-
bering that it was Sunday, and that a restaurant or lunch
house was being conducted at that residence, there is
nothing indicative of guilt in that transaction.    There is
nothing in this independent testimony which in our opinion
tends to connect defendant with the commission of the
offense.    Defendant or his wife or both were conducting a
restaurant or lunchroom at their residence which is close to
the depot, and defendant frequently met incoming trains.
Fowler was a section hand, and his business frequently called
him near the restaurant, and he was acquainted with Duncan.
Their meeting then, either on the day of or after the com-
mission of the crime, is not suggestive of crime.    If Duncan
knew the railway detectives as the state claims he did, there
was nothing unusual in his watching their movements if he
was advised, as the record shows he was, that the ticket office
had been broken into.    He frequently met trains as they came
before the day when the detective appeared upon the scene.
This being the entire record, we think there should have been
a verdict for the defendant, and that the trial court was in
error in not granting a new trial.    See, as sustaining our con-
clusions, *State v. Willis,* 9 Iowa, 582; *State v. Mikesell,* 70
Iowa, 176; *State v. Cowell,* 149 Iowa, 460; *State v. Jones,* 115
Iowa, 113.

II.   In any event, some of the instructions given by the trial court were erroneous. Instruction 15 reads as follows:

It is a question of fact for you to determine from all the evidence before you whether the witness Fowler has been corroborated as above explained, and in determining this question you have a right to consider the situation of the defendant and the witness Fowler.   That is, whether they were together, or where they were, at the time the witness Fowler broke and entered said building; what interest if any, the defendant took in watching for the so-called detectives of the railroad company; whether he received any portion of the stolen property at the time or very soon thereafter; and what, if anything, he did with any part of it; whether he received the revolver which he claimed was stolen at the time of the breaking and entering; and, if so, what he did with it.   And from these and all other facts and circumstances in evidence you must say whether or not witness Fowler has been corroborated as the law requires.

Assuming for the purpose of this discussion that there was some corroborating testimony, it is very clear to our minds that the circumstance of the finding of the revolver in the outhouse in no manner tends to connect defendant with the commission of the offense. Aside from the testimony of Fowler, there is nothing whatever to show that defendant ever saw, had possession of, or had anything to do with putting it in the vault of the outhouse.   This finding of the revolver did nothing more than show that some one had broken into the ticket office, and this the statute expressly says shall not be sufficient.   See *State v. Cowell,* 149 Iowa, 460; *State v. Jones,* 115 Iowa, 113.

2. SAME.

For the errors pointed out, the judgment must be, and it is, *Reversed.*