[1] Reported in 285 N.W. 898.
Convicted of the crime of carnal knowledge and abuse of a female child under the age of 18, defendant appeals from the judgment and from the order denying his motion for a new trial.
The picture of lechery disclosed by record and argument need not be redrawn. On the question of defendant's guilt (which he has stoutly denied from the first) there is plenty of evidence to support the verdict. The main question for the jury was doubtless one of identification, which was resolved against defendant.
The point decisive of this appeal arises from the state's impeachment of its own witness, one B.J. Sekerman. The date of the offense, as fixed by the state's evidence, was November 2, 1937; the place, room 201 of a boardinghouse in Minneapolis. Sekerman was called by the state in rebuttal. After preliminary questions, he was asked whether he had seen the prosecuting witness in room 201. He answered that he had. Asked again for the date of the morning that he saw her there, he answered, "I think it was in October, the last part of October." Asked again whether he would say it was not November 2, he answered, "Yes."
At this point assistant county attorney Van Lear claimed surprise. Persuading the court that such was the case, he was given leave to impeach the witness. He did it by reference to a previous unsworn statement, by way of question and answer, procured by a probation officer with the assistance of a stenographer. The statement itself was not put in evidence. But Sekerman was asked not only whether in that statement he had not fixed the time of the occurrence as November 2, but also whether at that time the landlady of the rooming house had not complained to him about some disorderly conduct of a "man and a girl in room 201." Persisting, the state showed that the witness had declared that he had seen defendant "come downstairs in a hurry and leave the building," followed immediately by the complaining witness. Another declaration *Page 360 
from the statement was one that the defendant had stated to the witness that a maid had "caught" defendant and the girl (the prosecutrix) in the room and "run them out."
The witness admitted having made the statement but claimed that he was under the compulsion of "force" in doing so. He testified that the force consisted of threats of seven years in the reformatory if he refused. The inference was that the effort of his examiners was to get defendant implicated.
It should be emphasized that, at the juncture where the state claimed surprise and thereon got permission to impeach, the witness had given no testimony adverse to the state except that some then unidentified occasion was late in October rather than November 2. He had not at that point said anything about defendant, nor had he suggested that defendant was or was not in the hotel on November 2. Notwithstanding the state was permitted to cross-examine not only as to date but also as to the presence of both prosecuting witness and defendant at the precise place and almost at the very moment of the crime.
That is not all. Redirect examination for the state went not at all to any discrepancy as to date, but proceeded in detail over that part of the statement identifying defendant as the man present in the room with the prosecuting witness at the determinative moment.
The story of the impeachment is not yet complete, for the state put on the probation officer who procured the statement and the stenographer who recorded and transcribed it. Each of them was interrogated and answered favorably to the state concerning the whole statement. The testimony was not confined to any mere question of time. The fact stressed by the state was not that the witness formerly dated some occurrence as of November 2 rather than late in October, the time given by him on the stand. The witnesses testified inclusively as to the declarations which had been made by Sekerman to them, untested by cross-examination and unvouched for by oath, identifying defendant as the guilty man.
1. In case of genuine surprise, while there are some jurisdictions holding otherwise, the right of a party, subject to the court's discretion, *Page 361 
to impeach his own witness is pretty well settled. The books carry no better discussion of the origin, evolution, and rationale of the rule than that of Mr. Justice Blume in Crago v. State, 28 Wyo. 215, 202 P. 1099. Selover v. Bryant, 54 Minn. 434,56 N.W. 58, 21 L.R.A. 418, 40 A.S.R. 349, discarded the former doctrine that the party calling a witness so far vouches for his credibility as to bar his impeachment. See 6 Dunnell, Minn. Dig. (2 ed. Supps.) § 10356.
There is normally the preliminary question for the trial judge whether the claim of surprise is well founded in fact. His decision thereon will not be disturbed unless abuse of discretion appears. The ruling allowing impeachment of Sekerman was made on the bare assertion of the assistant county attorney. See State v. Jensen, 151 Minn. 174, 186 N.W. 581. He had the question and answer statement of the unsavory witness. It was for the trial judge to determine whether the asserted and naïve lack of suspicion of a change of heart by Sekerman was well founded. (He had pleaded guilty of a crime similar to that charged against defendant.)
2. The rule is well settled that the only office of impeaching testimony of this kind is to negative or neutralize the testimony to which it is directed. (It may also discredit the witness as such.) 28 R.C.L. p. 645; Rosted v. G. N. Ry. Co. 76 Minn. 123, 78 N.W. 971; (Pullen v. C. M. St. P. P. R. Co. 178 Minn. 347, 227 N.W. 352). That is what Dean Wigmore calls the orthodox and "universally maintained" rule of American decision law. Although approved in the first (§ 1018), it is disapproved in the second, edition of Wigmore, Evidence (§ 1018). The disapproval of the learned author is put upon the ground that the impeached witness testifies finally under oath and subject to cross-examination. Hence, he concludes, "the whole purpose of the hearsay rule has been already satisfied," and so "there is nothing to prevent the tribunal from giving such testimonial credit to the extrajudicial statement as it may seem to deserve."
That, we submit with deference, is not enough to qualify the previous contradictory assertion as substantive evidence. The oath *Page 362 
of the witness solemnizes his former extrajudicial statement not at all. It goes only to his testimony which is occasion for and target of the impeachment. The previous statement was when made and remains an ex parte affair, given without oath and test of cross-examination. Important also is the fact that, however much it may have mangled truth, there was assurance of freedom from prosecution for perjury.
The chief merit of cross-examination is not that at some future time it gives the party opponent the right to dissect adverse testimony. Its principal virtue is in its immediate application of the testing process. Its strokes fall while the iron is hot. False testimony is apt to harden and become unyielding to the blows of truth in proportion as the witness has opportunity for reconsideration and influence by the suggestions of others, whose interest may be, and often is, to maintain falsehood rather than truth.
There are additional practical reasons for not attaching anything of substantive evidential value to extrajudicial assertions which come in only as impeachment. Their unrestricted use as evidence would increase both temptation and opportunity for the manufacture of evidence. Declarations extracted by the most extreme of "third degree" methods could readily be made into affirmative evidence. In criminal cases the defendant would have a similar opportunity to entrap the state's witnesses, and use as evidence all their extrajudicial assertions. The same enlargement of the field of inquiry would result in civil cases.
If presence of the witness in court, under oath and subject to cross-examination, is enough to permit admission of his previous statements, the result should not be confined to those which happen to be contradictory. The hearsay rule, if considered satisfied as to contradictory statements, would be equally so as to declarations agreeing with the testimony of the witness. The presence in court, under oath and subject to cross-examination, of the declarant, must serve to satisfy the hearsay rule as to both or as to neither kind of declaration. We hold that it is not satisfied in either case, and hence that the extrajudicial assertion brought in by way of impeachment must be confined to that field. *Page 363 
The foregoing we consider entirely consistent with the single purpose of rules of evidence, which is to disclose the truth. That implies the necessity for safeguards against abuse. The general admission of earlier, extrajudicial statements would, in practice, endanger rather than facilitate the truth-finding process. Different rules, of no present relevance, apply to admissions. Still another rule applies in a proper case where a witness has already testified, under oath and subject to cross-examination, concerning the same issue, and, because of death or some other reason, is unavailable when his testimony is wanted a second time.
3. The right to impeach one's own witness being well settled, there remains the inquiry as to sufficiency of the occasion therefor and the limits within which impeachment must be confined. There is no occasion for impeachment until the witness, to the surprise of the party calling him, testifies adversely on some material point.
As already shown, when the state claimed surprise by the testimony of Sekerman, he had gone no further than to indicate that his recollection of the date of some occurrence, not at the moment connected with defendant, had undergone a change. Only by faint implication was there any showing as required by State v. Jensen, 151 Minn. 174, 175, 186 N.W. 581, 583, "that the witness had previously stated he would testify" other than he did.
The next step is to apply the rule that the impeachment must be confined to the subject matter of the surprising and adverse testimony. Impeaching evidence can properly "go no farther." State v. Jensen, 151 Minn. 180, 186 N.W. 584. "The range of the rule is narrow, and its limitation should be carefully observed." Kuhn v. United States (9 Cir.) 24 F.2d 910, 913. See also State v. Noel, 66 N.D. 676, 268 N.W. 654. In order to enlarge the scope of the intended impeachment, the attorney, professing surprise, may not invite more harm by "continuing to put in damaging testimony after the witness's hostility or change of front has been discovered." Young v. United States (5 Cir.) 97 F.2d 200, 206, 117 A.L.R. 316.
Here that rule was rather flagrantly violated. In its impeachment of Sekerman, the state used the discrepancy as to date mainly *Page 364 
as a portal through which to bring additional statements contradictory of nothing to which Sekerman had testified when the claim of surprise was made. Those additional declarations, if true, were enough to show that defendant was guilty. That is, with the proof of the corpus delicti already in the record, that part of the extrajudicial statement which was improperly admitted as impeachment was, if believed, enough to insure conviction. The resulting great prejudice is obvious.
Our deliberate inclination is not to grant new trials, in civil or criminal cases, for mere technical error. State v. Jensen, supra. Our decisions "do not discourage a vigorous prosecution. They disapprove an unfair one." State v. Friend,151 Minn. 138, 141, 186 N.W. 241, 242. In this case the error was not merely technical. It was substantial and with plain prejudicial effect. There was no instruction, as there should have been, stating the limited purpose and scope of impeaching testimony. The result was a trial unfair to defendant on a vital point.
4. Having made appropriate objection to the state's impeachment of its own witness and having met with an adverse ruling thereon, it was not incumbent upon the defense to pester the court and lengthen the record by repeating the objection. Ordinarily one such clear-cut ruling is enough. Erdman v. Watab Rapids Power Co. 112 Minn. 175, 127 N.W. 487, 128 N.W. 454; Dell v. Marckel, 184 Minn. 147, 152, 238 N.W. 1.
The advantage to a litigant of such an objection and such a ruling may be waived, but we do not think it was here. When Mrs. Blanche Jones, the police matron who, along with the probation officer, took the statement from Sekerman, was on the witness stand, she was asked: "Did you at any time during that conversation or during that hearing up there threaten Sekerman in any way?" For the defense, Mr. Hughes then interposed as follows: "Wait — I will withdraw the objection. Go ahead." The question then pending, as to its subject matter, was narrowly limited to the supposed duress which had been claimed by Sekerman. It did not go beyond that or touch the general and larger question of the state's *Page 365 
right to impeach and the extent of the impeachment. The reach of the waiver must therefore be limited to the subject matter of the question the objection to which was withdrawn. We have quoted that portion of the record upon which the claim is based and consider it insufficient to show waiver by the defense.
There must be a new trial. Both judgment and order are reversed.