# STATE v. ERNEST L. ARMSTRONG.

101 N. W. (2d) 398.

February 11, 1960—No. 37,474.

296

*Ernest L. Armstrong,* pro se, for relator.

*Miles Lord,* Attorney General, *William B. Randall,* County Attorney, and *Frederick O. Arneson,* Assistant County Attorney, for respondent.

NELSON, JUSTICE.

Ernest Armstrong was accused of robbery in the first degree and entered a plea of not guilty to the charge. Prior to defendant's entry

of his plea, pursuant to a motion by the county attorney, the court entered its order substituting the name of Ernest Armstrong for the name of Richard Roe. The transcript indicates that during the trial Ernest Armstrong was referred to as Ernest L. Armstrong, Ernest Bubba Armstrong, and Bubba Armstrong, without any attempt at correction or objection on the part of the defense.

Defendant was tried before a jury, which returned a verdict of guilty. Before sentence defendant was again arraigned on a second information charging that he had been previously convicted of manslaughter in the first degree, and defendant admitted that he was the person so convicted. He was thereupon sentenced to a term according to law in a penal institution of this state for the offense of which he was convicted and one prior felony conviction.

Defendant petitioned this court for a writ of error, which it issued, and after serving his original brief, he petitioned the district court as an indigent for a transcript of the testimony at the trial. The district judge who presided at the trial ordered a transcript at county expense, including all the testimony produced at the trial and those portions of the state's summation in which a gun had been mentioned. The state produced 13 witnesses, all of whom testified at the trial. The defense offered no witnesses.

A search of the transcript suggests that the following facts are representative of the state's testimony and controlling on the issues herein: Prior to and on April 12, 1957, Eugene Harris and Thamin H. Foster occupied rooms as tenants at a Minneapolis residence described as 815 16th Avenue South. On the morning of April 12, a lady tenant living at the same address awakened Harris to answer a phone call from Ernest Armstrong. Harris answered the phone call in Foster's room, Foster being absent and in the bathroom at the moment. Armstrong asked Harris if he had a car or if he knew anyone who did and, if so, to inquire of that person if he would like to make a little run. Foster returned to his room while the telephone conversation was in progress, and Harris asked him if he wanted to drive a man. Foster asked Harris where the man wanted to go. Harris relayed the question to Armstrong, who said he wanted to go out on "Thirty-eighth and

something." Armstrong said he would buy the gas. Foster agreed to do this, and Harris then told Armstrong that they would pick him up at his house in about an hour.

Armstrong at that time lived at 1143 North Bryant, Minneapolis. Foster, accompanied by Harris in the front seat, drove his car to that address. Armstrong came out with two companions, Charles R. Douglas and David James. The three men got into the back seat of the car and one of the three directed Foster where to go. Foster stopped according to directions and the three men in the rear seat got out and Foster and Harris continued to circle the block. The three men entered a place on Chicago Avenue, just off 38th Street, where Verna Brown, who appeared as a witness for the state, operated a business called the Christy Office in partnership with one Orlin A. Hess.

Mrs. Brown testified at the trial that it was midmorning on April 12 when her sister, who was working alone in the front office, summoned her by a buzzer. Mrs. Brown entered the room and found her sister looking a bit panicky because three colored men were spaced out in front of the counter. Mr. Hess, who also came to the front office, asked the men what they wanted. Armstrong, whom Mrs. Brown identified at the trial, asked for a driver's instruction manual, and Mr. Hess picked one up and slid it down the counter to him. It appears that nothing else was said. At the trial Mrs. Brown identified each of the three men, stating that the one standing closest to her at the time was Douglas. She described in detail the clothing that each wore, and she testified that Armstrong, who was in the middle, wore a moustache which she described as fairly little, leaving the upper lip in relief. She also testified that the third man, identified as James, wore chin whiskers.

The three men only stayed about three minutes and left. Mrs. Brown discovered a money order blank missing from the counter, and someone in the office called the police. She watched the three men through the large front window after they left through the door located at the front left side of the office. They turned to the right, passed the front window, and walked on down to the next corner. Mrs. Brown's identification of Armstrong and each of his two companions was

positive. The transcript discloses that defense counsel cross-examined Mrs. Brown at considerable length, seeking to break down her testimony, and at last risked what might be termed the ultimate question as to whether Armstrong was one of the three colored men in the office that morning:

"Q.  You would bet your life on that would you, Mrs. Brown?
"A.  That is quite a high stake, yes."

Douglas, James, and Armstrong reentered the rear seat of the Foster car and Foster and Harris continued to occupy the front seat. One of the three directed that they drive to the office of the Como Shops Credit Union in St. Paul. Foster drove the car in search of the credit union but found the way blocked by a train. There was a back-seat suggestion that he turn around and drive to the Teddy Bar on Rondo Street, which was operated by one Russell Caldwell. All five entered the bar. Harris spoke with Caldwell briefly, listened to a record, and then left for a house across the street. About 15 minutes later he returned to the bar and as he reentered someone said, "Come on, let's go." The five men got into the car as before and proceeded toward the credit union office.

When they reached the credit union office, Foster drove into a parking space about five or six cars from the office entrance, turning off the engine and heading his car toward a number of railroad tracks. Armstrong, James, and Douglas got out and walked behind the parked cars toward the office entrance. Foster and Harris remained in the car listening to the radio. The three men returned once, walking past the car. They then proceeded back toward the entrance. In 5 or 10 minutes, the three men returned to the car and said, "Let's go." On the journey back to Minneapolis someone in the back seat dropped $200 in bills into the front seat, stating that Foster and Harris were to split it and that Foster was to get his car fixed in order to drive the men to Chicago. Foster was supposed to put his car in the shop that night or the next day for repairs. When they returned to the residence where Foster and Harris lived, all five got out of the car. Harris went upstairs and phoned for a cab, in which Armstrong and James later

left. Foster fixed himself a sandwich. Douglas asked Foster to drive him to North Minneapolis. After Harris and Foster had driven Douglas to North Minneapolis, the two of them went to a downtown bar and cafe.

It is clear from the transcript that Foster and Harris, while accomplices, each positively and independently identified Ernest Armstrong as one of the trio occupying the back seat of the Foster car from the time they met at the Armstrong address until they returned to where Harris and Foster lived and Armstrong and James left in a cab. Foster and Harris positively identified Armstrong as one of the trio although they did not particularly observe the trio entering the door to the credit union office; their operations inside; or their coming out of the door itself. Except for those brief intervals, their identification was positive and dovetails with the other evidence produced by the state's witnesses.

Finest Mazone testified that he owned the dwelling at 1143 Bryant Avenue North, that he lived at 1147 Bryant Avenue, and that Ernest Armstrong was his tenant at 1143 Bryant Avenue from February to April 16, 1957.

Bertram J. Schmuck, general manager of the credit union, testified that it had previously made a $200 loan to Eugene Harris, which was in default. He further testified that he went to lunch about 12:40 p. m. on April 12 leaving Mrs. Alice Schultz alone in the office; that it took him approximately 5 or 6 minutes to drive to his home; and that the phone rang as he entered his home and he learned from Mrs. Schultz that the credit union office had been robbed. He returned to the office and found Mrs. Schultz with a bruised forehead and a cut left eye. The door to the safe was open and the contents gone. He testified that he found $9,653 in cash, $870 in government bonds, and 93 money-order blanks missing.

Mrs. Schultz, the bookkeeper at the credit union office, gave the following testimony: She was working alone at the office April 12, 1957, when the robbery occurred. She described the credit union offices as being located in a remodeled box car. A partition divided the office into two parts, an outer office having two cashiers' cages

and a space for customers, the rear office containing several desks, files, cabinets, and the safe. One entrance door led from the parking lot into the front office.

Mrs. Schultz said she had been at one of the cages in the front office for the purpose of waiting on a customer, Jerome Marah. She cashed his check and received his payment on a loan. While Mr. Marah was putting away his money three colored men entered, causing Mr. Marah to move to one side. One of the men, whom she identified as James, stepped to the cage and spoke to her, Douglas standing to Marah's right rear and the third man standing directly behind Marah. Mrs. Schultz' testimony was positive in identifying Douglas and James. In describing the third man, she said that he stood behind Marah and had a thin moustache extending below his mouth on both sides. James did the talking. He wanted to see the manager about a loan. He had made a prior phone call that morning to which Mrs. Schultz referred and which he admitted making. The three colored men left the office, Mr. Marah leaving immediately afterward.

Mrs. Schultz had straightened things on the counter and started toward the inner office, when the same three colored men returned, taking the same positions as before. James put a gun on the counter of the cage and said, "Get over there." She backed up toward the inner office. Douglas came around the tellers' cages from her left and as she moved toward the door she either fell or was pushed into the inner office. Douglas took a position over her, told her to be quiet, slapped her, knocking off her glasses, and inflicted a small cut on her left eye and a black and blue mark under her right eye. Douglas held her hands and said to her, "Be quiet and shut up." She opened her eyes and Douglas slapped her twice. After that she kept her eyes closed. Douglas then said to her, "Open this," referring to the safe, and she said, "I can't." The safe door was unlocked at the time, the handle had merely been turned to keep the door closed. She heard the two cash drawers in the tellers' cages, as well as the safe drawers, being opened. After this someone said, "Come on." Douglas wrapped rope around her wrists and then she heard the door between the offices open, the entrance door open, and a car pull away. She twisted the rope off her

hands, found her glasses, and managed to reach the phone to call Mr. Schmuck. She stated that she had a good look at both Douglas and James but not at the third man. She did, however, positively remember that he wore a distinctive moustache.

Shortly before the trial, Douglas had been examined under oath before a judge of the district court. The court reporter who recorded that examination appeared as one of the state's witnesses, and he testified that Douglas had in effect stated as follows:

Douglas, Ernest "Bubba" Armstrong, and David James were the three robbers who entered the credit union on April 12, 1957, and took money in the presence of the woman in charge.

Douglas twice more repeated during that examination that the other two men who entered and robbed the credit union were James and Armstrong.

While the three—Douglas, James, and Armstrong—were in the credit union, Foster and Harris were in the car.

Earlier that day, the five of them—Armstrong, James, Harris, Foster, and Douglas—had been at the Teddy Bar.

When the car returned to the credit union, it was parked within four or five cars of the office. At that point, Armstrong, James, and Douglas got out of the car.

Harris had come to Armstrong's home on Thursday night while Douglas was there and they had discussed the robbery. The robbery occurred on the following day.

While at the Christy Office in Minneapolis, Harris and Foster remained in the car and did not leave it.

When called as a witness for the state, Douglas testified that he was one of the three robbers of the credit union on April 12, 1957; that he had plead guilty to the charge of robbery in the first degree; that he had been convicted of the offense; and that he was sentenced to the reformatory at St. Cloud. When asked to identify his two accomplices, Douglas asked the court if he had to answer. The court inquired his reason for not wishing to answer, and Douglas said that his answer "might incriminate somebody" other than himself. The court directed him to answer. Douglas then denied being personally acquainted with

Armstrong, denied seeing Armstrong on April 12, 1957, and denied that Armstrong was one of the two men who, with Douglas, entered and robbed the credit union. Douglas at this time said that the three who robbed the credit union were David James, Harris, and himself. The state claimed surprise and was permitted by the court to cross-examine Douglas as to whether or not, while under oath in an earlier examination, he had been asked certain questions and had given the answers summarized above. Douglas denied giving such answers and again claimed that the third man in the robbery was Harris. He also then claimed that only he and one other man had entered the Christy Office; that five men were in the Teddy Bar, including himself, James, Foster, and Harris. He said he did not know who the fifth man was and denied that it was Armstrong.

Mr. Marah testified that he could positively identify Douglas and James as the men who entered the credit union office but that he could not identify the third man except to say that he was colored.

Orlin A. Hess testified that he was present when three colored men entered his office on the morning of April 12, 1957. He positively identified Douglas and James as two of the men. He saw only the back of the head of the third man and was unable to state whether or not that man was Armstrong.

Russell Caldwell, who operated the Teddy Bar, said the five men entered his place between 11:30 and 12 noon on April 12, 1957. He positively identified Armstrong and Douglas as two of the men. He testified that he had seen Armstrong in his place before; that this was the only large group that had entered his place that forenoon; that the robbery was talked about in his place after it had happened and he read newspaper accounts of the robbery; and that at the time he connected the five men with the robbery.

A striking bit of corroborating circumstantial evidence was furnished as a part of the state's evidence. Charles J. Wetherille, inspector of detectives of the Minneapolis Police Department, testified that he twice interviewed Ernest Armstrong at the Minneapolis city jail on May 7, 1957. The first conversation did not relate to the credit union robbery. During the second interview Armstrong denied that he had been in

any holdup, denied that he had been in Chicago for a long time, and denied that he had ever been in Chicago with David James. Armstrong was shown a picture of three persons taken in a Chicago night club, which was later received in evidence at the trial. This picture shows Armstrong wearing a moustache, such as was described by the state's witnesses, and David James (with chin whiskers), and a woman seated between them. Armstrong at the time protested that the picture had been taken a long time ago—long before Christmas 1956. Following the interview Inspector Wetherille wrote to an address indicated on the back of the picture. The letter read in part:

"To complete an investigation here, we are trying to find out on what date a picture of three colored people was taken at the Blue Note at 3 North Clark Street. The number on the back of the picture is 12-5-103. I would appreciate hearing from you as soon as possible."

The letter was returned with the following data noted thereon:

"Neg. 12-5-103—assume it is this year 1957 Have looked up negatives for 103 12-5-103

> (5 is the code for the Blue Note
> 12 is the 12th shot i. e. the 12th negative

"It is a picture—the negative
woman in center, a man on each end
Appears the men have moustaches
"The 103 is the 103 day of the year. That was Saturday April 13, 1957."

Inspector Wetherille, on May 9, again interviewed Armstrong showing him the letter he had written to Chicago with the typed answers thereon. Armstrong then admitted he had been in Chicago April 13 and that he had been with James, but he still denied that he had anything to do with the robbery. Wetherille then asked Armstrong if he was along with James in Chicago on the morning of April 13 when James paid $1,200 cash for an automobile, and Armstrong admitted that he was and admitted that the picture was taken on April 13, 1957. He said that he met James in Chicago but denied that he had flown there with him.

While this evidence may be characterized as wholly circumstantial, it nevertheless furnishes authoritative as well as sufficient and effective corroboration of Armstrong's part in the robbery. It supports the testimony of accomplices, Foster and Harris, who testified for the state at the trial. It corroborates any and all identification testimony. It lends support to the less positive identification testimony as a part of a whole network of evidence establishing defendant's complicity and actual participation in the robbery. The distinctive moustache worn by Armstrong and the chin whiskers worn by James are telltale marks of identification that cannot be ignored.

Defendant in general contends that there was a lack of competent evidence to sustain the verdict of the jury because the robbery victim, Mrs. Schultz, was unable to sufficiently identify Armstrong and further contends that the testimony of Foster, Harris, and Douglas, accomplices, has not been sufficiently corroborated.

■ We think that the following facts shown by the evidence given by accomplices and corroborated by other evidence establishes positive identification:

Armstrong, James, and Douglas left the car, walking toward the credit union, some 50 feet away. They returned to the vicinity of the car a few minutes later but only momentarily, then walked again toward the credit union. Foster and Harris did not leave the car near the credit union.

The three men returned to the car in a few minutes and directed it to be driven away. Foster drove back to his home. En route, $200 in bills were dropped into the front seat to be split between Foster and Harris.

All five got out of the car at Foster's home. Harris phoned for a cab, and Armstrong and James left. Douglas asked Foster and Harris to drive him to North Minneapolis, which they did.

Harris' identification of Armstrong was positive.

Foster's identification of Armstrong was positive.

This court in State v. Schabert, 222 Minn. 261, 268, 24 N. W. (2d) 846, 850, held that the appellate court upon review of the evi-

dence on a claim that the evidence was insufficient to support the verdict "must take the most favorable view of the state's testimony of which it is reasonably susceptible, and it must be assumed that the jury believed the state's testimony and disbelieved that which contradicted it." In giving consideration to defendant's claim that the evidence was insufficient to support the verdict, the state's evidence must be assumed to have been accepted wholly by the jury.

■ We think defendant's claim that the testimony of the accomplices was insufficiently corroborated untenable since the evidence shows the following corroborating facts:

Association with the other two identified robbers at the Christy Office an hour or more before the robbery and positive identification by Verna Brown.

Association with the same two robbers and the two accomplices only minutes before the robbery, while at the Teddy Bar and positive identification by the operator of the bar.

The calling of a cab about 1:20 p. m. (35 minutes after the robbery) which took two colored men from the house where Foster and Harris lived to within a block of Armstrong's home.

Association of Armstrong with identified robber James in Chicago the following morning and evening.

Present when $1,200 cash paid for car in Chicago, title taken in James' name.

Distinctive thin moustache noted by Mrs. Schultz and worn by Armstrong, as shown by photo. Same distinctive thin moustache testified to by Verna Brown.

James, defendant's friend, did have the chin whiskers as shown by photo and described by Mrs. Brown.

Armstrong's original denial to Inspector Wetherille that he had ever been with James in Chicago; that he had been in Chicago during 1957; his claim that the photo had been taken long before 1957. Later admissions when confronted with the letter that he had been in Chicago with James the morning after the robbery and that the photo was taken that same evening.

It was the rule at common law that the uncorroborated testimony of an accomplice, if it satisfied the jury beyond a reasonable doubt of the guilt of the defendant, was sufficient to warrant a conviction, but the trial judge was under duty of giving a cautionary instruction concerning the weight of such testimony. Because of dangers incident to a conviction upon the uncorroborated testimony of accomplices, statutes were enacted in this and other states prohibiting a conviction upon the testimony of an accomplice unless it is corroborated by other evidence.

M. S. A. 634.04 reads:

"A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

The reasons for requiring the testimony of an accomplice to be bolstered by corroborating testimony have been stated by this court in State v. Smith, 144 Minn. 348, 175 N. W. 689, and State v. Jackson, 198 Minn. 111, 268 N. W. 924. The rule since the enactment of the statute is, however, that it does not require a case to be made out against a person accused of a crime sufficient for his conviction before the testimony of an accomplice can be considered, but the corroborating evidence must, independent of the testimony of the accomplice, tend in some degree to establish the guilt of the accused but need not be sufficiently weighty standing alone to justify a conviction. State v. Korsch, 168 Minn. 354, 210 N. W. 10; State v. Baker, 161 Minn. 1, 200 N. W. 815; State v. Whitman, 103 Minn. 92, 114 N. W. 363, 14 Ann. Cas. 309; also see, 5 Dunnell, Dig. (3 ed.) § 2457. Evidence relating exclusively to the fact of the commission of the crime and the circumstances thereof, as distinct from defendant's connection therewith, would not be sufficient. See, State v. Duncan, 158 Iowa 652, 138 N. W. 913.

It is to be borne in mind when considering the testimony of more than one accomplice, as we are doing here, that the accom—

plices are not deemed to corroborate each other. That is, if two or more accomplices are produced as witnesses, they are not deemed to corroborate each other; but the same rule is applied and the same confirmation is required as if they were but one. Therefore, corroboration by independent evidence cannot be dispensed with even though several accomplices testify against the accused. See, State v. Scott, 203 Minn. 56, 279 N. W. 832, with cases and authorities therein cited.

The court in its charge instructed the jury that as a matter of law they must consider Douglas, Foster, and Harris to be accomplices and, to warrant a guilty verdict, the jury must find that their testimony was corroborated as required by law. The court read § 634.04 to the jury and further instructed the jury concerning the corroboration required. No exception to the correctness of the charge was taken by defense counsel and defendant does not challenge that portion of the charge before this court.

■ In State v. Rasmussen, 241 Minn. 310, 313, 63 N. W. (2d) 1, 3, the court considered the corroboration of an accomplice's testimony, stating:

"* * * The rule is satisfied if the corroborative evidence in some substantial degree tends to affirm the truth of his testimony and to point to the guilt of the defendant. It need not be sufficiently weighty that standing alone it would make out a prima facie case or sustain a conviction. The corroboration may come from the testimony of the defendant himself. *Circumstantial evidence may be sufficient to corroborate the testimony of an accomplice.* The entire conduct of the accused may be looked to for corroborating circumstances, and if from those circumstances the connection of the accused with the crime may fairly be inferred, the corroboration is sufficient. Thus, for example, sufficient corroboration may be furnished by the conduct of the accused, such as being present at the scene of the crime or in the company of the accomplice, when such conduct is coupled with suspicious circumstances such as unseasonableness of the hour, inclemency of the weather, lack of apparent reason for his presence, or subsequent denial of his presence." (Italics supplied.)

Section 634.04 does not require that the state produce corroborative evidence which by itself would be sufficient to sustain a conviction. It is enough if it tends to connect the defendant therewith. State v. Smith, 144 Minn. 348, 175 N. W. 689.

■ In State v. Taran, 176 Minn. 175, 180, 222 N. W. 906, 908, this court said:

"* * * The statute does not make an accomplice incompetent but does require corroborative evidence."

An accomplice who has pleaded guilty is not disqualified from testifying against other defendants. McCormick v. United States (8 Cir.) 9 F. (2d) 237.

■ Since the state's evidence must be credited and assumed to have been accepted wholly by the jury, we see no escape from the conclusion that the proof raised a strong case of both direct and circumstantial evidence from which the jury would be entitled to find the defendant guilty, the corroborating testimony having fully met the requirements of the statute. Circumstantial evidence alone could well in the instant case be sufficient to corroborate the independent testimony of any one of the accomplices testifying; i. e., Harris, Foster, and Douglas. As has been said in State v. Rasmussen, *supra,* the entire conduct of the accused may be looked to for corroborating circumstances, and if from those circumstances the connection of the accused with the crime may fairly be inferred, the corroboration is sufficient. Let it not be overlooked that sufficient corroboration may be furnished by the conduct of the accused himself when such conduct is coupled with suspicious circumstances, such as the evidence in this case fairly discloses.

■ Defendant says the trial court committed error in failing to discharge him upon motion made for that purpose on the ground that he was not furnished with a copy of the indictment until the date of arraignment because it was originally entitled "State of Minnesota vs. Charles Richard Douglas, John Doe and Richard Roe" and did not name or describe defendant. This contention finds its answer in § 628.13, which provides:

"When a defendant shall be indicted by a fictitious or erroneous name, and in any stage of the proceedings his true name shall be discovered, it may be inserted in the subsequent proceedings, referring to the fact of his being indicted by the name mentioned in the indictment."

See Nelson v. National Cas. Co. 179 Minn. 53, 228 N. W. 437, 67 A. L. R. 509, where this court held that a defendant who pleads to an indictment in the district court without objection waives an amendable irregularity in the indictment.

Defendant also contends that it was error to allow the photo to be introduced in evidence since it was made in Chicago with no one present in court to substantiate that fact. Able counsel for defendant did not object to the offer. Both the photograph and letter concerning it were shown to Armstrong during the course of his interview with Inspector Wetherille and were the basis for their discussion in which defendant made certain admissions concerning his association with James on the morning following the robbery and the taking of the photograph. Clearly, the photograph and letter shown to Armstrong, coupled with his admissions to the inspector as testified to by the inspector, constitute a proper foundation for receipt in evidence of both photograph and letter. Defense counsel advised the court that the defense had no objection to their receipt.

Defendant enters objection that there was continual reference during the trial about a gun, said gun being at no time in evidence during the trial. Mrs. Schultz testified that James put a gun on top of the teller's cage. This testimony was at no time denied by the defense, and it was not improper for the prosecution to refer to it either in the opening statement or in the summation to the jury.

Clearly, the defendant's contention that the defense counsel was restricted in argument does not apply to his summation to the jury upon the record before the court. If it is directed to arguments to the court on questions of law in support of defense counsel's objections, then the situation was one presenting matters purely within the trial court's discretion.

■ The defendant finally presents a blanket contention that the court erred in its rulings on objections made by defense counsel and upon issues of law relative to trial procedure. Defense counsel objected at the trial to the ruling permitting the state to contradict its witness Douglas, essentially on the point of the identity of the third man in the robbery trio. It is to be observed, however, that the state did not seek to impeach this witness generally since his testimony as to the robbery, that three persons including himself and James were involved, was desired and not contested at any time during the trial. It is well established that a party, when surprised by adverse testimony, may, in the discretion of the court, contradict the testimony of his own witness. See, Selover v. Bryant, 54 Minn. 434, 56 N. W. 58, 21 L. R. A. 418; 20 Dunnell, Dig. (3 ed.) § 10356.

The author in 1 Underhill, Criminal Evidence (5 ed.) § 232, states the rule as follows:

"The state is not bound by testimony of a witness who unexpectedly proves hostile. Witnesses may be cross-examined or impeached by the party calling them when they prove to be hostile, * * *.

"A proper foundation should be laid in order to impeach a witness. The party must first show that the evidence as given, has taken him by surprise and that the witness is hostile. The witness may then be asked if he have made contradictory statements out of court, the times, places and circumstances of the statements being described to him in detail. * * * The witness must testify expressly, and in terms to facts which are in direct contradiction to his prior extrajudicial statements.

"* * * The extent to which the impeachment of one's own witness may be carried is largely a matter of judicial discretion."

We think the transcript clearly indicates Douglas' desire to evade answering the question. He virtually warned the state that if pressed to answer he might not answer truthfully. It may be that he did not wish for some reason, personal to himself, to incriminate Armstrong. The court's charge properly included a specific instruction to the jury explaining the status and effect of the negative testimony given by the

court reporter. No exception was taken thereto or to any part of the court's charge.

█ Finally defendant claims that the prosecution relied solely on circumstantial evidence to prove its case. Circumstantial evidence may, if sufficiently convincing, support a verdict of guilty. However, here the state relied upon both direct and circumstantial evidence, although the latter was much the greater.

In State v. Pankratz, 238 Minn. 517, 536, 57 N. W. (2d) 635, 646, this court said:

" '* * * The law makes no distinction between circumstantial evidence and direct evidence as to the degree of proof required for conviction, but respects each for such convincing force as it may carry and accepts each as a reasonable method of proof. Either will support a verdict of guilty if it carries the convincing quality required by law * * *.'

"The court's instruction correctly stated the law with respect to circumstantial evidence."

Also, circumstantial evidence may properly furnish the required corroboration of an accomplice's testimony.

"* * * The rule as to corroboration is statutory, and should not be extended beyond the limits fixed by statute. * * * we are convinced that the admission of the accomplice that the fire was set is well corroborated by circumstantial evidence." State v. Demopoulos, 169 Minn. 205, 207, 210 N. W. 883, 884.

We reach the conclusion that the evidence as a whole, though in part circumstantial, is of sufficient weight and force to amply sustain the jury's verdict of guilty in the instant case.

Affirmed.