## STATE v. EARL GUY.

105 N. W. (2d) 892.

November 4, 1960—No. 37,925.

*Bradford & Kennedy* and *Keith D. Kennedy,* for appellant.

*Walter F. Mondale,* Attorney General, *George M. Scott,* County Attorney, and *Per M. Larson* and *Ronald I. Meshbesher,* Assistant County Attorneys, for respondent.

KNUTSON, JUSTICE.

Defendant was convicted of forgery in the second degree. He appeals from an order denying a motion for a new trial and from the judgment.

On Friday, April 24, and Saturday, April 25, 1959, a large number of counterfeit payroll checks, purported to have been issued by Minneapolis-Honeywell Regulator Company, were passed in St. Paul and Minneapolis. At least 64 of such checks reached the hands of police in the two cities. The checks were a good replica of genuine Honeywell payroll checks.

The main thrust of this appeal is directed at the sufficiency of the evidence to corroborate the testimony of one Jack Archer, who had entered a plea of guilty to forgery and was an admitted participant in passing ten of such checks. He testified that at about 7 p. m. on April 24, 1959, he (Archer), one Zack LeMon, and defendant met at 2938 Cedar Avenue in south Minneapolis. There he saw defendant hand LeMon an envelope containing ten checks payable to G. H. White, each in the amount of $97.86. LeMon was also given a false driver's license made out to G. H. White. Archer and LeMon then took a bus to the vicinity of 1400 East Franklin Avenue in Minneapolis, where LeMon gave Archer one of the checks and the driver's license. Archer then went to a shoestore on Franklin Avenue, where he purchased a pair of shoes and cashed one of the checks,

receiving in cash the amount thereof, less the amount of the purchase. He then returned to LeMon and was given another check, which he cashed in like manner in Meyers Department Store, using the driver's license as identification. The charge against defendant is based on the cashing of this check. Archer's photograph was taken at Meyers Department Store on a regiscope. Leaving the store, Archer rejoined LeMon, and they returned to 2938 Cedar Avenue together. Between 9 and 10 p. m. on the same day they went to Bob and Ray's Tavern on Cedar Avenue and Lake Street. There they met defendant, who inquired "how did things go," to which Archer replied that he had cashed two checks.

The following noon Archer and LeMon purchased a used Chevrolet automobile for $60 under the fictitious name of James Runyon. The car bore license number 3E 4489. The two of them then drove around and cashed eight more of the checks, which defendant had given LeMon, in the same manner in which they had cashed the two checks the day before. At about 6 p. m. they returned to 2938 Cedar Avenue, where defendant was waiting for them. Defendant then counted out the money they had left and retained half of it, amounting to about $400. The other half was later divided between Archer and LeMon. While they were at 2938 Cedar Avenue, Dwight Anderson, age 11, and Carl Anderson, age 9, entered the room. LeMon told them to go outside. Archer returned the false driver's license to defendant.

Archer said that he then took the car they had purchased to his residence, where it remained until the following Wednesday, April 29. He gave the keys to defendant, who said that he would have the car picked up that evening. Archer never saw the car again. Archer then mentioned to defendant that his picture had been taken at Meyers Department Store, but defendant told him not to worry about it.

It is obvious that, if the foregoing testimony of Archer is sufficiently corroborated by admissible evidence to meet the requirements of our statute, the jury was fully justified in returning a verdict of guilty.

As corroboration, the state showed that a green Chevrolet car bearing license number 3E 4489 was picked up by the police in front of 2718 Garfield Avenue South, the home of one Arnold Lund, who

was a friend of defendant. The state thereafter showed that Arnold Lund had cashed a Honeywell payroll check similar to those cashed by Archer at Meyers Department Store.

The state called as a witness one George Knight, an illiterate negro, who testified that he was brought to Minneapolis from Omaha, Nebraska, by a man named Cary. He said that he was taken to a house in or around Minneapolis, the exact location of which he did not know, between 9:30 and 10 a. m. Knight waited in this house until about 11:30 a. m., when a man by the name of Sandberg arrived. At about 1:30 p. m., while Knight, Sandberg, and Cary were in the living room of the house, defendant arrived. Knight testified that after defendant spoke to Cary, Sandberg said: "That is the man we had been waiting on." Knight then testified that defendant and Sandberg walked to the kitchen of the house. He could not hear what they said while in the kitchen. Defendant and Sandberg came out of the kitchen in about 10 minutes, and Sandberg said: "It is time for us to go now." Thereafter, Knight, Cary, and Sandberg left the house and drove off in Sandberg's station wagon.

Near downtown Minneapolis the trio stopped at Kick's Liquor Store, where Knight was given a counterfeit Honeywell payroll check similar to the check which Archer had cashed at Meyers Department Store, except that it was payable to G. W. Jones in the amount of $76.68 and bore an endorsement on the back of the check. Knight could neither read nor write. Knight was also given a driver's license to use as identification. He entered the liquor store, bought a pint of whiskey, cashed the check, and returned to the car, giving Sandberg the proceeds of the check. They then made two additional stops at supermarkets and Knight cashed two additional checks, one at a Red Owl Store and one at a National Tea Store, in both of which photographs of him were taken on a regiscope, although he was not aware of it at the time.

Knight testified that he did not know that the checks were forgeries, since he could neither read nor write, but he became suspicious after cashing the third check, so he said something and gave the driver's license back to Sandberg. Thereafter they drove back to the house from which they had started, and a short time later Knight and Cary began the trip back to Omaha.

On April 30, 1959, Meyers Department Store received from its bank the check Archer had cashed there on April 24. The check was turned over to the police immediately. Archer thereupon was arrested and interrogated, and shortly thereafter, apparently as a result of such interrogation, police officers were dispatched to 2938 Cedar Avenue to arrest LeMon. When they arrived there, one of the police officers walked to the rear of the building and saw a man look out of the window of the house. Other officers entered the front hallway, where they found defendant at the head of a stairway on the second floor. They asked him for his name, and he replied, "Earl Guy." They asked him what he was doing in the building, and he said that he was looking for a man by the name of Johnson, who was supposed to be living on the first floor. When the detectives knocked at the door of the place where Johnson was supposed to be living they found Zack LeMon. Mrs. Anderson and her two sons, Dwight and Carl, were also there. Both LeMon and defendant were thereupon placed under arrest and taken to police headquarters.

Defendant contends (1) that the evidence is insufficient to corroborate the testimony of Archer; (2) that the court erred in admitting evidence relating to the cashing of checks by the witness Knight; (3) that the court erred in permitting the state to impeach its witness Dwight Anderson; and (4) that the court erred in its instructions to the jury and its refusal to give requested instructions that will be discussed hereinafter.

■ That Archer was an accomplice of whoever else took part in uttering the check cashed at Meyers Department Store can hardly be open to question. For this reason, under Minn. St. 634.04,[1] a conviction cannot rest on his testimony alone. The rules respecting the sufficiency of corroborative evidence have been amply stated in prior

---

[1]Minn. St. 634.04 reads:

"A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

decisions of this court.[2] Such corroborative evidence need not be sufficient to support a conviction if standing alone. The rule requiring the corroboration has its roots in the common law.[3] Now made a rule of law by statute, corroboration is required because the testimony of an accomplice is considered to be inherently untrustworthy, largely for the reason that he may testify against the defendant in the hope of obtaining clemency for himself.[4] Thus, corroborative evidence is sufficient when it is weighty enough to restore confidence in the truth of the accomplice's testimony.[5]

Applying these rules to the case at bar, it is apparent that the corroborative evidence, if properly admitted, is sufficient to meet the legal tests. No good purpose could be served by restating the evidence which we consider sufficient beyond what has already been said.

■ Dwight Anderson, an 11-year-old boy who lived with his mother at 2938 Cedar Avenue, which is the same place at which LeMon lived, was called as a witness by the state. He testified that he knew LeMon and Archer and had seen them at 2938 Cedar Avenue but that he did not know defendant and had not seen him there. Claiming surprise, the state was permitted to impeach this testimony by calling Russell Green, a police officer, and the principal of the school where Dwight was a student. Both testified that Dwight had been interviewed by the officer in the presence of the principal and that he had first denied knowing defendant, whose picture was exhibited to him, but later admitted that he knew the man in the picture but did not know his name. Detective Green testified that—

"* * * he had seen him there once having coffee, that he was sitting at a table with LeMon and Archer and that his mother was present in the room and that when he and his brother Carl entered the room the men stopped talking and LeMon gave Dwight a quarter and told the boys to go outside and play."

---

[2]See, State v. Rasmussen, 241 Minn. 310, 63 N. W. (2d) 1; State v. Armstrong, 257 Minn. 295, 101 N. W. (2d) 398.

[3]See, 7 Wigmore, Evidence (3 ed.) § 2056.

[4]7 Wigmore, Evidence (3 ed.) § 2057; State v. Rasmussen, 241 Minn. 310, 63 N. W. (2d) 1.

[5]7 Wigmore, Evidence (3 ed.) § 2059.

The jury was instructed, in effect, that this evidence was not admitted as substantive proof of defendant's guilt but only for the purpose of impeaching the testimony of Dwight that he did not know defendant and had not seen him at the place in question.

It is settled law in this state that the state may impeach its own witness in a case of genuine surprise.[6] There must, however, be a genuine surprise.[7] The state should not be permitted to present to the jury hearsay evidence under a subterfuge of surprise.[8] Defendant contends that that is what was done here. Mere disappointment with the testimony of a witness is insufficient to establish surprise. There must be some showing that the testimony given is adverse to that which the prosecution had a right to expect.[9] Whether there is genuine surprise or not presents a preliminary question for determination by the trial court, and ordinarily we will not reverse unless there is an abuse of discretion.[10] Here it appears that the prosecuting attorneys had not interviewed the witness prior to calling him but did rely on a report given them by the police officer. It can hardly be doubted that the police officer is a part of the investigative machinery of the prosecutor's office and that reliance often must rest upon the investigation of such officers. We think that such reliance should suffice and that the court did not abuse its discretion in holding that there was sufficient showing of surprise.

Defendant complains of the court's refusal to instruct that the testimony of Officer Green and the school principal should be disregarded entirely. The court did instruct:

"Now, the evidence of contrary or inconsistent statements by Gerald Anderson[11] upon another occasion is in the case simply for the

---

[6]State v. Saporen, 205 Minn. 358, 285 N. W. 898; State v. Armstrong, 257 Minn. 295, 101 N. W. (2d) 398.

[7]State v. Lemke, 207 Minn. 35, 290 N. W. 307.

[8]See, State v. Gulbrandsen, 238 Minn. 508, 57 N. W. (2d) 419; Young v. United States (5 Cir.) 97 F. (2d) 200, 117 A. L. R. 316; see, also, Annotation, 117 A. L. R. 326.

[9]State v. Jensen, 151 Minn. 174, 186 N. W. 581.

[10]State v. Saporen, 205 Minn. 358, 285 N. W. 898.

[11]The court erroneously referred to the witness as Gerald, when his true name was Dwight, but this mistake was corrected at the end of the charge.

purpose of impeaching or discrediting the statement of Gerald in this case on trial. All statements of Gerald Anderson at any other time or place and as a witness in this case regarding this defendant are not substantive evidence in this case. That is, dependent upon itself, it cannot be considered by the jury in determining the guilt or innocence of this defendant, except in so far as it may be considered discrediting the testimony given in this case by Gerald Anderson.

"The evidence upon which a conviction may be predicated must be entirely outside the statements or the evidence of Gerald Anderson at any other time than as a witness in this case."

While the instruction could have been much more explicit, we think that it sufficiently informed the jury that the testimony of the officer and the school principal could not be considered as substantive proof of guilt.[12]

■ In connection with the necessity for corroboration of the testimony of an accomplice, the court instructed the jury:

"Now, to make a witness an accomplice it must appear that a crime has been committed; that the person on trial committed the crime either as a principal or as an accessory and that the witness cooperated with, aided or assisted the person on trial in the commission of the crime whether as a principal or as an accessory. The test as to whether or not a witness is an accomplice is, would he have been indicted or informed against and punished for the offense with which the defendant is charged. And the Court rules that as a matter of law, the witness, Jack Archer, was an accomplice in this particular case."

Defendant contends that this instruction was prejudicial because it left an implication that Archer was an accomplice of defendant and thereby, in effect, held that defendant was guilty of the crime of which he was charged. The instruction is not a model of clarity. Where the evidence is conclusive, as it is here, that a witness was a participant in the crime, the jury should be instructed that he is an accomplice as a matter of law and that his testimony requires corroboration. Such

---

[12]State v. Gulbrandsen, 238 Minn. 508, 57 N. W. (2d) 419.

instruction is for the benefit of the defendant in that it informs the jury that a conviction cannot rest upon the testimony of such witness alone, and the defendant is entitled to have the instruction given where there is no dispute in the evidence.[13] Care should be exercised, however, not to leave the implication that the witness is an accomplice of the defendant.

If the instruction quoted above stood alone it would be vulnerable to the attack which defendant directs against it, but it is elementary that the charge of the court must be read as a whole. The court made it clear throughout the charge that defendant must be found guilty beyond a reasonable doubt. The court did not charge that Archer was an accomplice of defendant, and, while the quoted instruction, if standing alone, might be open to that implication, we are satisfied, after carefully considering the entire charge, that the jury could hardly have been misled as to the necessity of proof of the guilt of defendant beyond a reasonable doubt. Not every statement of the court, if taken out of context, even though erroneous if read separately, justifies a new trial. Here we are convinced that the instructions, if read as a whole, amply covered the requirement of proof of guilt of defendant and that what the court was dealing with here was a definition of an accomplice and the necessity for corroborative proof before the testimony of such accomplice could be considered.

■ Defendant next complains of the failure of the court to submit to the jury the question whether a conspiracy existed between defendant, Archer, and LeMon and the others who were involved in the Knight episode. The court did not deal with this matter at length but apparently ruled as a matter of law that a conspiracy had been established.

The distinction between a trial for conspiracy and determination of the existence of a conspiracy as a question preliminary to the admission of statements of coconspirators as evidence in a trial for the commission of some other crime must here be kept in mind. Defendant was not being tried for conspiracy. The question arose only in an eviden-

---

[13]State v. Elsberg, 209 Minn. 167, 295 N. W. 913; State v. Hopfe, 249 Minn. 464, 82 N. W. (2d) 681.

tiary aspect. In that area, determination of the preliminary question of competency of the evidence is not different from determining whether other evidence is admissible. Proof of a conspiracy as a preliminary to admission of acts or statements of one coconspirator against another need not be beyond a reasonable doubt where the defendant is not on trial for conspiracy.[14]

We think that the correct rule is that, where a conspiracy arises only as an incident to the admissibility of evidence, its existence must be determined by the court the same as any other preliminary question affecting the competency of the evidence.[15]

Furthermore, here the evidence of Knight was admissible under the rule permitting proof of similar acts of defendant. Defendant's connection with the utterance of the checks passed by Archer and those passed by Knight was sufficient to justify admitting the testimony of Knight under the rule that they show a common system, scheme, or plan and, as such, furnish some corroboration for the testimony of Archer.[16]

Defendant contends that there were so many differences in the manner in which Archer and Knight proceeded that the requisite similarity in plan is absent. The differences are in minor detail only. The checks, with the exception of the name of the payee and amount, are identical. The manner of cashing and identification was likewise nearly identical except that Knight was an illiterate person and the checks cashed by him were preendorsed. It is enough if the evidence shows such a substantial similarity that an inference is justifiable that as far as defendant is concerned he operated under a common scheme or plan. Here that similarity does exist.

Other errors of minor importance are claimed by defendant. We have examined in detail a voluminous record and lengthy briefs and see no necessity of further extending this opinion. We are convinced that defendant has had a fair trial and that there are no prejudicial errors that would warrant a new trial.

---

[14]State v. Dunn, 140 Minn. 308, 168 N. W. 2.

[15]See, McCormick, Evidence, § 53.

[16]State v. Bock, 229 Minn. 449, 39 N. W. (2d) 887.

Attached to the state's brief as an appendix are questions put to LeMon subsequent to the trial of this case and his answers thereto when he appeared before the court upon a plea of guilty to a charge arising out of this same affair. Defendant moves to strike such questions and answers. They are no part of the settled case in this appeal and may not be considered by this court. The motion to strike is granted.

Affirmed.