STATE v. FRANK EUGENE SPENCER.

216 N. W. 2d 131.

March 8, 1974—No. 43963.

*C. Paul Jones,* State Public Defender, and *Doris O. Huspeni,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Gary W. Flakne,* County Attorney, and *Theodore R. Rix, Michael McGlennen,* and *Vernon E. Bergstrom,* Assistant County Attorneys, for respondent.

Heard before Knutson, C. J., and Peterson, Todd, and Yetka, JJ., and considered and decided by the court.

YETKA, JUSTICE.

Following a jury trial, defendant was convicted in Hennepin County District Court of aggravated assault and sentenced to an indeterminate term, not to exceed 10 years, in the custody of the commissioner of corrections. He appeals from the judgment of conviction. We affirm.

On Saturday evening, February 12, 1972, Allen Berryman, an off-duty Minneapolis police officer, was shot in the back while working as a bouncer at the Northern Bar in the city of Minneapolis. Although Berryman was hospitalized for some time, he has recovered from the shooting.

Berryman testified at trial that he arrived at the Northern Bar at approximately 10:10 or 10:15 p.m. on the night he was shot. He was to start work at 10:30. As he walked into the bar, the officer noticed that the heel of his boot had fallen off. He hung up his coat, obtained a flashlight from the bartender, and returned to the parking lot behind the bar to look for the heel.

Berryman was not in uniform that evening but was wearing a pullover sweater and knit slacks.

He found the heel to his boot directly under the front door of his car. While kneeling beside his car, Berryman observed a man and woman leaving the bar through the back door. The two were arguing. As Berryman stood up, he observed the man strike the woman in the face with his closed fist. Berryman testified that he was standing approximately 15 feet from the couple when he saw the man first strike his companion.

As Berryman started to walk past the couple, toward the back door of the bar, he again saw the man strike his companion. At that time the officer was within 6 feet of the couple and looking straight at the man. He continued by the couple and paused. He testified, "I turned around and thought I should say something * * *. As I turned around, he struck her again."

Berryman then addressed the man, saying in effect: "Sir, this is not the place to do it. Why don't you go home and have your argument." The man responded with an obscenity and pulled a pistol from his belt and leveled it at the officer's head.

At this point, Berryman was approximately 15 feet from the couple and facing them. Behind him, some 3 to 5 feet was the back entrance to the bar.

While the gun was leveled at his head, Berryman saw and heard his assailant pull back the hammer and cock the weapon. He described the gun as a small caliber revolver, .22 or .25, with white or pearl handles and he stated that it appeared to be old as some of the blueing was worn from the barrel.

Berryman raised his hands and quickly apologized for interfering. In fear of his life, he turned his back to his assailant, "and just as I turned my head away I heard a shot and then I fell." He staggered into the bar and told the bartender that he had been shot and to call a squad car and an ambulance.

A few hours after the shooting, the defendant was arrested at his home and charged with aggravated assault in the shooting of Berryman.

At trial, the state, by use of fingerprint evidence, placed defendant at the Northern Bar at the approximate time of the shooting and Officer Berryman identified the defendant as his assailant. The state also introduced two .22-caliber revolvers, both seized from defendant's home, pursuant to a valid search warrant, on the morning following the shooting. One of the weapons was a worn .22-caliber revolver with white handles.

Defendant does not claim that the evidence was insufficient to support the finding of guilt but asserts three errors in the trial as prejudicial.

■ Defendant contends that it was error for the trial court to admit into evidence the results of a neutron activation analysis of his hands which tended to show that he had fired a gun on the night of the shooting.

After he was taken into custody, but prior to the time he was booked in the county jail, defendant's hands were swabbed with a nitric acid solution. The swabs were later sent to the Treasury Department laboratory in Washington, D. C. for neutron activation analysis, a testing procedure which can determine the presence and amount of certain chemical elements.

The state introduced into evidence at trial the results of the neutron activation analysis of defendant's hands. Mr. Maynard Pro, of the Alcohol, Tobacco and Firearms Division of the Treasury Department, testified, over the continuing objection of the defense, that the chemical analysis of defendant's right hand, based upon the samples taken on the night of his arrest, showed 1.67 micrograms of barium and 1.33 micrograms of antimony. The presence of these elements, in the opinion of Mr. Pro, was conclusive that defendant's right hand was associated with firing a gun.

On cross-examination of Mr. Pro by the defense, the following colloquy took place:

"Q. And what is the percentage of the unreliability?

"A. There is no unreliability as far as we are concerned. We are only saying that the man handled and fired a gun. We are

460

not saying what type of gun, what type of bullet he used. We are only using the amount of barium and antimony to show he fired a gun, and the quantity is actually of no real significance, it is there. There is no question about it."

The reliability of neutron activation analysis in identifying the chemical composition of evidentiary materials was recognized by the United States Court of Appeals for the Sixth Circuit in United States v. Stifel, 433 F. 2d 431 (6 Cir. 1970), certiorari denied, 401 U. S. 994, 91 S. Ct. 1232, 28 L. ed. 2d 531 (1971). In that case, a homicide was committed by sending a package bomb through the mails. The state used neutron activation analysis to examine the composition of the bomb debris. Government experts concluded that the elemental composition of the bomb was identical with certain materials found in the storeroom at the accused's place of employ. Experts in Stifel were permitted to testify that some of the materials—vinyl tape and a metal cap —from which the bomb was made were "of the same manufacture" and "from the same batch" as materials found in a storeroom to which defendant had access. 433 F. 2d 436.

Some 76 cases are listed in 15 Am. Jur., Proof of Facts (1973 Supp. p. 22) in which the results of neutron activation analysis were admitted in evidence. However, there is no appellate case among the 76 listed where neutron activation analysis is held admissible to establish that a suspect had actually fired a gun.

While there seems to be little doubt that neutron activation analysis can accurately detect the presence and amount of certain chemical elements, it is doubtful that it can *conclusively* establish that those elements were present as the result of firing a weapon. The elements of barium and antimony may be found in varying amounts on the hands of many people who have not fired a weapon. Mr. Pro himself conceded that the elements of barium and antimony could have come from some 100 sources other than gunpowder.

However, the presence of these chemicals together in the amounts found on this defendant's hands could reasonably pro-

vide some evidence that defendant had fired a gun. We hold the trial judge did not err in admitting the test results in evidence. We are concerned, however, about the sweeping and unqualified manner in which Mr. Pro's testimony was offered. Where expert testimony concerning a new scientific technique is heard by a jury, there is danger that the evidence may be given more weight than is warranted.

An expert witness could be permitted to testify that in his opinion the chemicals present on defendant's hand may have resulted from the firing of a gun. He should not have been permitted to state, as he did, that this defendant had definitely fired a gun. To allow this testimony to stand without a cautionary instruction to the jury was technical error.

While it would have been better had the state's expert been less conclusive, he was subjected to a thorough cross-examination and we do not find the error prejudicial to the extent that it could be said to have affected the result. See, State v. Schifsky, 243 Minn. 533, 69 N. W. 2d 89 (1955) ; 3 Am. Jur., Appeal and Error, § 1007. Moreover, defense counsel made no objection to the court's instructions on expert testimony.

In State ex rel. Trimble v. Hedman, 291 Minn. 442, 456, 192 N. W. 2d 432, 440 (1971), we stated that the weight and credibility to be given the opinion of an expert lies with the factfinder. Here the record as a whole sustains the view that, in light of the cross-examination of Mr. Pro, the jury was not prejudiced. Nevertheless, we would caution that expert testimony in this and other emerging technological fields is vulnerable to overzealousness and self-interest.

It is the responsibility of the court and of counsel for both the state and the defense to insure that expert opinions do not, in the advocacy of a new idea or scientific method, abridge the rights of an accused to the fair and objective inquiry to which he is entitled in criminal proceedings.

We believe that neutron activation analysis is a useful law-enforcement technique and that the increasing use of technology

in criminal investigations should not be inhibited but encouraged where consistent with the rights of the accused.

■ Defendant contends that it was error for the court to admit into evidence the out-of-court statement of a prosecution witness and to fail to caution the jury that the statement could not be considered substantive evidence of the truth of the statement.

The statement in controversy was given to officers at the police station by defendant's girl friend immediately after his arrest. She stated then that she had been with the defendant at the Northern Bar earlier that evening and that they had had an argument while at the bar. Her written statement read in part:

"As the argument progressed, Spencer suggested we go get in the car, and we walked out the back door. A few steps outside the door we stopped and Spencer slapped me in the face a couple of times. At this time a man came up to Spencer and Spencer turned against him. * * * I started to walk towards his car. As I got into the car I heard a shot."

At trial the girl friend was called as a prosecution witness and she denied that she argued or fought with defendant at the Northern Bar. The state claimed surprise and impeached her over defense objection by using her prior written statement. After the defense, by cross-examination, attempted to rehabilitate the witness by showing that she had had too much to drink and that the officers may have put words in her mouth, the state introduced the statement in evidence. The defense failed to object to the introduction and expressly stated on the record that it had no objection.

Following the court's instructions to the jury, the court inquired of both counsel whether they had comments or suggested instructions. Again, defense counsel stated on the record that he had no objection. Defendant now claims error in the instructions with regard to the impeachment testimony.

This court in State v. Saporen, 205 Minn. 358, 361, 285 N. W.

898, 900 (1939), set forth the rule on impeachment testimony which has since been followed and favorably cited:

"The rule is well settled that the only office of impeaching testimony * * * is to negative or neutralize the testimony to which it is directed. (It may also discredit the witness as such)."

However, Saporen is easily distinguishable from the case at bar. In Saporen, the court found that there was no genuine surprise to the prosecution which could justify its impeaching its own witness. Further, in Saporen the court pointed out that the state used a discrepancy to bring out additional statements which, if believed, would "insure conviction." 205 Minn. 364, 285 N. W. 902. This was not the case here.

Reliance by a prosecutor on an extrajudicial written statement given a police officer by a witness is sufficient to justify a claim of surprise by the state when the witness, at trial, testifies contrary to the prior written statement. State v. Guy, 259 Minn. 67, 105 N. W. 2d 892 (1960).

Here the prosecutor did not enlarge upon the impeaching evidence so as to unduly prejudice the defendant. See, State v. Saporen, *supra,* and State v. Jensen, 151 Minn. 174, 180, 186 N. W. 581, 584 (1922).

It was only after the defense had attempted to rehabilitate the witness that her entire extrajudicial statement was introduced. The prosecutor had a right to introduce the statement as a whole in order to rebut and discredit the explanation given by the witness for the inconsistency between her testimony and her pretrial answers. State v. DeZeler, 230 Minn. 39, 41 N. W. 2d 313 (1950).

While the trial court's failure to give a cautionary instruction constituted technical error, it is not prejudicial where, as here, the defense did not request that such an instruction be given. State v. Daml, 282 Minn. 521, 162 N. W. 2d 240 (1968); State v. DeZeler, *supra.*

■ The defense contends that it was error for the trial court

to instruct the jury that they need not find the element of intent in order to find defendant guilty of aggravated assault.

The court gave the following instruction with regard to intent:

"* * * I might say that there were comments made by counsel during the closing arguments with respect to the necessity for the presence of intent. Under a revision of our statutes there is no intent required. The language is as follows, as I again repeat: 'Whoever assaults another and inflicts great bodily harm is guilty of the offense of Aggravated Assault.'"

This court established in State v. Ott, 291 Minn. 72, 189 N. W. 2d 377 (1971), that Minn. St. 609.22, which defines assault as an offense requiring intent, and § 609.225, which defines aggravated assault, would be read together. And that an *"intentional* infliction of great bodily harm" constituted aggravated assault. 291 Minn. 75, 189 N. W. 2d 378. (Italics supplied.) Therefore, intent of the defendant was an essential ingredient in this trial. The prosecutor conceded such in his closing argument and, considering all of the facts in the case, we find it should not be grounds for reversal.

The record shows that throughout the entire trial of this case the controversy centered around whether this defendant was the individual with whom Officer Berryman had the confrontation in the parking lot of the Northern Bar. The jury answered that he was. The jury having found that the defendant held a loaded gun on the officer, deliberately cocked the weapon, and then fired a bullet into Berryman's back, it could infer that he intended the natural and probable consequences of his act. State v. Peters, 274 Minn. 309, 143 N. W. 2d 832 (1966).

The court's instruction as to intent was obviously in error. However, in view of the facts here, and because the defense did not object to the erroneous instruction, it does not constitute reversible error.

Affirmed.

MR. CHIEF JUSTICE SHERAN, not having been a member of this

court at the time of the argument and submission, took no part in the consideration or decision of this case.

MR. JUSTICE SCOTT took no part in the consideration or decision of this case.