STATE of Minnesota, Respondent,

v.

Revelle LOVING, Appellant.

No. A08–1492.

Supreme Court of Minnesota.

Dec. 17, 2009.

874

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Thomas A. Weist, Assistant Hennepin County Attorney, Minneapolis, MN, for respondent.

Marie Wolf, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

ANDERSON, G. BARRY, Justice.

A Hennepin County jury found appellant Revelle Loving guilty of first-degree premeditated murder for the January 16, 2007, shooting deaths of Mosetta Peters and Ja'Naurri Allen. On appeal, Loving argues that the district court abused its discretion by admitting (1) gunshot residue

evidence, and (2) relationship evidence. He also raises eight arguments in a pro se supplemental brief. We affirm.

In the fall of 2002 Loving began dating Mosetta Peters. In July 2003, Peters had a baby, M., and Loving was the father. Loving was released from a juvenile facility in April 2004 and visited his child even though he and Peters had an argumentative relationship. Loving and Peters periodically lived together beginning in the fall of 2004.

The conflicts between Loving and Peters escalated and, in some instances, included police involvement. In 2005 Loving and Peters had an altercation at the apartment of Peters's foster sister. During the argument, Loving picked up Peters and threw her on the floor. Loving told Peters's foster sister to "get her before I f* * * her up." In July 2006 a police officer went to Peters's apartment after a 911 hang-up call. The officer noticed that there was a broken doorway frame, and issued a pick-up and hold order for Loving for 911 interference. Later that month, another police officer responded to a disturbance call at Peters's apartment. Peters had a red mark on her face and red marks on her right arm. Loving was present and told the officer that he and Peters had had an argument. Loving was cited for misdemeanor domestic assault.

Around September 2006, Peters began dating Ja'Naurri Allen and he eventually moved in with her, but Peters maintained contact with Loving. One of Peters's co-workers at a Montessori school testified that in December 2006 Loving went to the school and got into an argument with Peters. The co-worker heard Loving say the word "kill." After Loving left, Peters was crying and shaking, and told her co-worker that Loving said that if he ever saw Peters and his child get into Allen's car again, he would kill Allen and Peters. Peters's sister

also testified that Peters told her that Loving had threatened to kill Allen and Peters.

In late December 2006 Loving and his grandmother picked up M. and did not return her to Peters. Loving testified that M. made allegations that Allen had touched her on her private area. Peters's foster sister testified that she heard Loving say to Peters over a speakerphone, "I know ain't nobody touched my daughter. I just want to make your life miserable."

Allen's stepfather testified that around January 6, 2007, he noticed that Allen had a black eye. Allen told his stepfather that he had been in a fight with "his girl's baby daddy" at the apartment complex where he had been staying with Peters. The "girl's baby daddy" had tried to swing a bat at Allen and Allen told his stepfather that "the motherf* * * * *" says he's going to kill me." Allen also told his stepfather that because of the incident, he wanted to move. A few days later, Allen's stepfather noticed the windows on Allen's car were broken, and Allen again referenced "his girl's baby father."

Around January 12, Peters moved out of her New Brighton apartment with Allen, and they moved in with Peters's foster sister at Villa Del Coronado Apartments in Brooklyn Park. On January 16, 2007, at about 10:16 p.m., several people saw two men in the parking lot of Villa Del Coronado Apartments. The two men had arrived in what appeared to be a silver sport utility vehicle (SUV). They were wearing black clothes; one was carrying a long rifle and was wearing gloves and a dark coat. The two men approached a parked car and fired gunshots into it. Police arrived several minutes later and found Allen and Peters dead inside the parked car. Allen died from 14 gunshot wounds and Peters died from multiple gunshot wounds.

Courtney Saffold, a codefendant who pled guilty to two counts of accomplice after the fact to aiding and abetting murder, testified that he had been driving with Loving and Loving's brother Ronelle in a tan Santa Fe SUV the evening of January 16. Saffold testified that Loving was wearing a large coat and had an AK–47 and 9 millimeter gun in the back seat. While Saffold was driving the SUV, Loving told him to turn into the Villa Del Coronado Apartments parking lot. Loving and Ronelle got out of the SUV; Loving had the AK–47 and Ronelle had the 9 millimeter gun. Saffold heard the two guns fire. Saffold testified that after Loving and Ronelle returned to the SUV, Loving seemed relieved and as they drove away, Loving said "I got him." At trial, Saffold identified a photo of the SUV he had driven. The SUV had been leased to T.H. from January 11 to January 21, 2007. T.H. had loaned it to her roommate, A.W., whose boyfriend was Ronelle (a.k.a., "Midnight"). Police found a red hat containing DNA consistent with Saffold's DNA in the parking lot shortly after the shooting.

Around 3 a.m. on January 17, Loving went to the home of James Salter wearing a black hooded sweatshirt and jacket. Salter testified that Loving took a shower at Salter's apartment and talked about an AK–47, a 9 millimeter gun, and a shooting. Salter said that Loving bought clothes from him, and Loving put the clothes he had been wearing into a Cub Foods bag. Salter also testified that as Loving was leaving, Loving said, "Man, I got—I wanted to change. I got gunpowder on my clothing."

In the early afternoon of January 17, Loving voluntarily went to the police and gave a taped statement. He denied knowing Allen, claimed he did not possess guns, had never shot or held a gun, and had last been in proximity to a fired gun when he was 12 or 13 years old. Police arrested Loving on January 22 and conducted a search of his car. In the trunk they found a dark coat and a plastic Cub Foods bag that had a black pair of pants and one glove in it. A latent print examiner identified Loving's fingerprint on the bag.

D.D., who shared a jail cell with Loving in March 2007, testified that Loving told him that Loving and his younger brother Ronelle used an AK–47 and a 9 millimeter gun to shoot Loving's girlfriend and her boyfriend in a car. Cell phone records indicated that Loving, Ronelle, and Saffold had been in the Brooklyn Park area on January 16, although they did not use their cell phones from 9:49 p.m. to 10:29 p.m. Loving testified at trial and denied being in Brooklyn Park on January 16, denied seeing Saffold that evening, and denied admitting to D.D. any involvement in the shooting.

A forensic expert performed gunshot residue (GSR) testing on the coat, pants, and glove from Loving's car. The expert used a scanning electron microscope with an energy dispersive X-ray system (SEM/EDX) and found GSR (three-element particles of antimony, barium, and lead) on the coat, and particles consistent with GSR (two-element particles) on the coat, pants, and glove. Loving's expert agreed with the findings concerning the coat and glove. The district court held a pretrial hearing on the admissibility of the GSR evidence and determined that testimony about the GSR from the coat was admissible, but testimony about the two-element particles from the pants and glove was not admissible. Later, the district court ruled that the relationship evidence with respect to Loving, Peters, and Allen was admissible to show evidence of a strained relationship between Loving and the decedents, but did not permit evidence about the decedents' fear of Loving. The

jury found Loving guilty of two counts of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2008). The district court sentenced Loving to two concurrent terms of life in prison without possibility of release. Loving appealed his convictions.

## I.

 Loving argues that the district court abused its discretion when, after a *Frye–Mack* hearing, it ruled that testimony about gunshot residue found on the coat from Loving's car was admissible. Novel scientific evidence is evaluated using a two-pronged *Frye–Mack* standard: "The district court must first determine whether the novel scientific evidence offered is generally accepted in the relevant scientific community. Second, the court must determine whether the novel scientific evidence offered is shown to have foundational reliability." *State v. MacLennan*, 702 N.W.2d 219, 230 (Minn.2005) (citing *Goeb v. Tharaldson*, 615 N.W.2d 800, 814 (Minn.2000)) (citations omitted). If the scientific technique that produced the evidence is no longer considered novel or emerging, the focus should be on the second part of the test. *State v. Roman Nose*, 649 N.W.2d 815, 819 (Minn.2002).[1] Further, the evidence must meet the requirements of Minn. R. Evid. 402 and 702 by being relevant, given by a qualified expert, and helpful to the trier of fact. *Goeb*, 615 N.W.2d at 814.

Loving does not contest the district court's determinations under the first prong.[2] Instead, he contests the court's findings under the second prong: the foundational reliability of SEM/EDX analysis and of the GSR evidence, findings we review for abuse of discretion. *See id.* at 815.

Loving challenges the district court's conclusion that SEM/EDX analysis and the GSR evidence are reliable. He concedes that SEM/EDX analysis is accurate in identifying GSR and that the State's forensic expert accurately identified GSR on the coat. But Loving argues that SEM/EDX testing of clothing is unreliable because of the inadequacy of the meaning of SEM/EDX testing results: "[T]he fact that the SEM/EDX test is effective at revealing particles of some combination of barium, lead, or antimony is not sufficient." Loving's claim is that even though SEM/EDX testing can detect GSR, there is no way to determine how or when GSR lands on clothing because GSR can be transferred in a number of ways, does not disintegrate, and can remain on clothing even after washing. Essentially, Loving asserts that the test's inability to determine how or when GSR got on the clothing indicates that the meaning of the test is unreliable.

Further, Loving argues that the test results are unreliable in this instance given

---

**1.** Minnesota Rule of Evidence 702 requires that all expert witness testimony have foundational reliability, regardless of whether a "novel" scientific theory is involved.

**2.** Under the first prong, the district court found that there was a general acceptance within the relevant scientific community of the following items: (1) using SEM/EDX to test for GSR; (2) classifying the residue found on the coat as GSR because there were four three-element particles of antimony, barium, and lead; and (3) stating that a positive test for GSR on clothing means that the clothing

(a) was worn by a person who discharged a firearm; (b) was in close proximity to a discharging firearm or recently discharged firearm; or (c) touched or was touched by something or someone that had GSR. The court referred to the first two meanings as primary transfer and the third as secondary transfer. The court also concluded that there is no agreement in the scientific community on which possibility of transfer is most likely, and therefore did not allow testimony on whether one possibility of transfer was more likely than another.

the many ways that the GSR could have landed on the coat, the impossibility of determining what the actual cause of transfer was, whether primary transfer (from a discharging gun) or secondary transfer (from contact with someone or something already containing GSR), and the uncertainty about whether the coat that was tested matched the description of one of the coats worn by the shooters.

We disagree with Loving's claims. The district court did not abuse its discretion in concluding that SEM/EDX testing for GSR on clothing is reliable in general, and that the evidence in this instance is reliable. At the *Frye–Mack* hearing, the experts for the State and for Loving agreed that the SEM/EDX method was reliable in testing for GSR on clothing. In addition, both experts agreed that the test had accurately identified GSR on the coat. Lastly, the expert performing the test followed approved procedures while testing for GSR.[3] Thus, there was sufficient foundational reliability for the evidence. Loving's argument about the inadequacy of the test's meaning is an argument about the weight of the evidence, not the reliability of the evidence. The multiple possibilities of how or when GSR could have been transferred to the coat do not make SEM/EDX analysis or the GSR evidence unreliable or unreliable as to him.

Loving also argues that the district court should not have admitted the GSR

evidence because it failed to meet the helpfulness requirement under Minn. R. Evid. 702,[4] and under Minn. R. Evid. 403 its probative value was substantially outweighed by the possibility of unfair prejudice. Loving's claim is that the GSR evidence was confusing and not helpful to the jury since the import of the State's expert testimony was merely that Loving *may or may not* have discharged or handled a gun, *may or may not* have been in close proximity to a discharging gun, or the coat *may or may not* have touched or been touched by something or someone with GSR. Loving further contends that the prejudicial effect of the evidence was great since juries potentially accord more weight to scientific testimony, and the State emphasized the evidence in closing argument.

We have previously said that it is not acceptable for an expert to state as a definitive conclusion of a GSR test that a person fired a gun, but that it is acceptable to state that the person "may" have done so. *State v. Spencer*, 298 Minn. 456, 461, 216 N.W.2d 131, 134 (1974).[5] Loving has not provided and we are not aware of any authority that requires an expert's testimony about the meaning of GSR test results to definitively link a person to a specific shooting in order for the evidence to be reliable and helpful to the trier of fact.

The district court did not abuse its discretion in concluding that the evidence was

**3.** Although the State's forensic expert misidentified a two-element particle as a three-element particle and was later corrected by Loving's expert, it was essentially a clerical error and ultimately had no bearing on the admissibility of the GSR evidence on the coat.

**4.** Minnesota Rule of Evidence 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or edu-

cation, may testify thereto in the form of an opinion or otherwise."

**5.** In *Spencer*, the method of testing for GSR was neutron activation analysis, not SEM/EDX, and the testing was performed on skin, not clothing. *Spencer*, 298 Minn. at 459–60, 216 N.W.2d at 133–34. Nevertheless, our statement in *Spencer* concerning the limits of permissible testimony about the results of GSR testing is applicable to SEM/EDX testing for GSR on clothing.

helpful to the jury. Even though the GSR evidence could not be tied to a specific shooting, Loving was reportedly concerned about GSR being on his clothing a few hours after the shooting, attempted to change his clothing that night, and the coat was found in Loving's car, which was in his control from the time of the shooting until the coat was discovered. Further, Loving had stated in an interview with the police that he did not possess guns, had never shot or held a gun, and had not been close to a discharged gun since he was 12 or 13 years old. Although the GSR evidence did not definitively establish that Loving fired a gun, the evidence made that possibility appear more likely than if the test had been negative.

In addition, the record does not sustain the claim that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The jury was informed of evidentiary limitations and what conclusions could and could not be drawn from it (i.e., that there are a number of ways that GSR can be transferred, and that no priorities should be given to the various possibilities).

The district court therefore did not abuse its discretion in admitting the GSR evidence concerning the coat.

## II.

■ Loving also argues that the district court abused its discretion in allowing relationship evidence because its probative value was outweighed by its prejudicial effect. We review a district court's evidentiary ruling for an abuse of discretion. *State v. Graham*, 764 N.W.2d 340, 351 (Minn.2009). Absent a clear abuse of discretion, we will not reverse a district court's evidentiary ruling. *State v. Moua*, 678 N.W.2d 29, 37 (Minn.2004). For a reversal of a district court's evidentiary

ruling, Loving must prove that the admission of evidence was erroneous and prejudicial. *See State v. Rhodes*, 627 N.W.2d 74, 84 (Minn.2001). We will reverse the district court's ruling if the error substantially influenced the jury's decision. *Moua*, 678 N.W.2d at 37.

Loving contends that the district court should not have allowed relationship evidence in the form of testimony from six people; three testified about Loving threatening to kill one or both of the decedents, and three testified about Loving engaging in violent or abusive behavior against the decedents. Specifically, Loving argues that because the court ruled prior to trial that there was insufficient evidence of a pattern of domestic abuse for the first-degree domestic-abuse murder charge, there was no need for relationship evidence.

Loving also argues that the evidence was not needed to establish motive since there was a second theoretical motive: Loving's accusation that Allen sexually assaulted his daughter. Further, Loving claims that the primary effect of the relationship evidence was to prejudicially characterize him as a violent and angry person in the eyes of the jury. Thus, he argues that the evidence had a low probative value that was outweighed by its prejudicial effect. Loving contends that this was not a harmless error since the State repeatedly referred to this evidence and it unfairly influenced the way the jury evaluated the rest of the evidence. The State argues that Loving's recent threats to kill the decedents and his assaultive behavior are probative in showing motive, identity, intent, and premeditation.

Minnesota Rule of Evidence 404(b) provides that "[e]vidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." But such

evidence may be admitted if offered to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *Id.* Nevertheless, Minn. R. Evid. 404(b) states that

> such evidence shall not be admitted unless (1) the prosecutor gives notice of its intent to admit the evidence . . .; (2) the prosecutor clearly indicates what the evidence will be offered to prove; (3) the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence; (4) the evidence is relevant to the prosecutor's case; and (5) the probative value of the evidence is not outweighed by its potential for unfair prejudice to the defendant.

Consistent with Minn. R. Evid. 404(b), relationship evidence is character evidence that may be offered "to show the 'strained relationship' between the accused and the victim [and] is relevant to establishing motive and intent and is therefore admissible." *State v. Mills*, 562 N.W.2d 276, 285 (Minn.1997). Relationship evidence is treated differently than other evidence offered under Minn. R. Evid. 404(b). *State v. McCoy*, 682 N.W.2d 153, 159 (Minn. 2004). The notice requirement under Minn. R. Evid. 404(b) is not a condition for admissibility of evidence directly pertaining to the relationship history between the defendant and the victim. *Id.*

Preliminarily, however, we note that Loving does not contest the admissibility of the evidence under the first four requirements of Minn. R. Evid. 404(b): notice, purpose, proof of the acts by clear and convincing evidence, and relevance.[6] He only argues that the evidence should not have been admitted because the probative value of the evidence was outweighed by its potential for unfair prejudice.

We conclude that the district court did not abuse its discretion in admitting the relationship evidence. We have previously held that "[w]here relevant to show a strained relationship . . . evidence of past abuse of or threats against the victim or her family by the defendant has generally been deemed admissible against 404(b) challenges." *State v. Bauer*, 598 N.W.2d 352, 365 (Minn.1999). In addition, such evidence has further probative value when it serves "to place the incident for which appellant was charged into proper context." *See id.* at 364.

Here, Loving had denied meeting or knowing Allen. The relationship evidence helped to show that there was a relationship between Loving and Allen, and further, that the relationship between Loving and both of the decedents was strained. Loving's multiple threats and assaultive behavior toward Allen and Peters as a result of Loving's tumultuous relationship with Peters helped provide context to the incident. Therefore, the relationship evidence helped establish motive, intent, identity, and premeditation. Loving's assertion that the State had no need of the evidence or that it was cumulative is unconvincing. Further, the district court instructed the jury prior to the relationship testimony and prior to final deliberations that Loving was not being tried for and could not be convicted of any offenses other than those charged. Therefore, the district court did not abuse its discretion in admitting the relationship evidence.

## III.

 Loving also raises eight arguments in his pro se supplemental brief. First, he contends that the district court abused its discretion in denying his motion

---

6. The district court admitted the evidence under Minn. R. Evid. 404(b), not Minn.Stat.
§ 634.20 (2008) (which allows evidence of similar domestic abuse).

to dismiss due to lack of probable cause for his arrest. With respect to this claim, we must independently review the facts to determine the reasonableness of the actions of the police. *State v. Camp*, 590 N.W.2d 115, 118 (Minn.1999). A district court's finding that police had probable cause to make an arrest will not be set aside unless it is clearly erroneous. *Id.* "Probable cause to arrest exists when 'the objective facts are such that under the circumstances "a person of ordinary care and prudence (would) entertain an honest and strong suspicion" that a crime has been committed.'" *Id.* (quoting *State v. Johnson*, 314 N.W.2d 229, 230 (Minn. 1982)). When more than one officer is involved in an investigation, the *"entire* knowledge of the police force is pooled and imputed to the arresting officer for the purpose of determining if sufficient probable cause exist[ed] for an arrest." *State v. Conaway*, 319 N.W.2d 35, 40 (Minn.1982). Having reviewed the record, we conclude that the district court's finding of sufficient probable cause for the police to arrest Loving was not clearly erroneous based on the statements concerning harassment, motive, rocky relationship, deterioration of an alibi, and collective knowledge of the police.[7]

■ Next, Loving argues that the district court abused its discretion in denying his motion to suppress evidence because of alleged Minn. R.Crim. P. 4.02 and 4.03 violations based on the theory that there were insufficient reasons for extending the time before which he had to appear before a judge, and the 36–hour advisory statement used for a probable cause determina-

tion for his arrest contained an intentional error. We conclude there was no violation of Minn. R.Crim. P. 4.02 because there was cause to enlarge the time before which Loving was to first appear before a judge. *See* Minn. R.Crim. P. 34.02. Further, there was no violation of Minn. R.Crim. P. 4.03 because the record does not establish that there was an intentional fabrication in the 36–hour advisory statement, and there was sufficient evidence for a finding of probable cause independent of the misplaced statement. *See* n. 7, *supra.*

■ Loving also claims that the district court abused its discretion in denying his motion to suppress evidence as a result of an illegal search and seizure. Because we conclude that there was probable cause to arrest Loving, and the search of the car was conducted based on a valid search warrant, the evidence obtained as a result of the search and seizure was admissible.

Next, Loving contends that the district court abused its discretion in denying his motion to suppress evidence of threats to kill Allen and Peters, prior bad acts evidence and relationship evidence because the probative value of the evidence was outweighed by its prejudicial nature, and admitting the evidence violated the Confrontation Clause. We disagree based on the reasons already stated in Section II of this opinion, and because the evidence admitted was non-testimonial. *See Crawford v. Washington*, 541 U.S. 36, 51–52, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

■ Loving additionally alleges ineffective assistance of counsel because he contends that his trial attorney failed to

---

7. Part of Loving's argument relies on a chronological error in the 36–hour advisory statement of probable cause to detain Loving. Page two of the statement indicates that James Salter gave a statement to police and that Loving was arrested after Salter's statement. The statement should have said that

Loving was arrested and then Salter gave his statement 10 hours later. As noted by the district court, the chronological error in the 36–hour advisory statement does not affect the conclusion that there was probable cause to arrest and detain Loving independent of Salter's statement.

call defense witnesses who had information relevant to Loving's trial theory, thereby violating his right to a fair trial and right to call witnesses. To prove ineffective assistance of counsel, a defendant "must affirmatively prove that his counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gates v. State,* 398 N.W.2d 558, 561 (Minn. 1987) (citation omitted) (internal quotation marks omitted). In addition, there is a strong presumption that an attorney's representation is within the range of reasonable professional assistance. *State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986).

We conclude that the record is sufficient for review and that the appellant did not receive ineffective assistance of counsel or have his right to call witnesses violated. Counsel has discretion to make decisions to determine which witnesses to call. *See State v. Mems,* 708 N.W.2d 526, 534 (Minn.2006) ("What evidence to present and which witnesses to call at trial are tactical decisions properly left to the discretion of trial counsel."). Further, Loving has failed to indicate who should have been called to testify, what evidence would have been presented through witness testimony, or how the result of the proceedings would have been different because of the witness testimony.

Loving also asserts that the district court abused its discretion in sentencing him to life without possibility of release when he had no prior convictions. Loving, however, was properly sentenced to life in prison without possibility of release because of his conviction of first-degree premeditated murder under Minn.Stat. § 609.185(a)(1). *See* Minn.Stat. § 609.106, subd. 2(1) (2008).

Next, Loving contends that the jury erred in finding him guilty of two counts of first-degree murder because there was insufficient evidence. When reviewing a claim for sufficiency of the evidence, " 'we are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged.' " *Bernhardt v. State,* 684 N.W.2d 465, 476 (Minn.2004) (quoting *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978)). In reviewing a jury verdict, "we view the evidence in a light most favorable to the verdict and assume that the jury believed the state's witnesses and disbelieved contrary evidence." *State v. Brocks,* 587 N.W.2d 37, 42 (Minn.1998). Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, we conclude that the jury could have reasonably found Loving guilty of first-degree premeditated murder.

Lastly, Loving argues that the district court abused its discretion in denying his request for a hearing challenging items of restitution. But the district court found that the proper amount of restitution to the claimants was established by a preponderance of the evidence and that there was no factual dispute about the restitution items or the dollar amounts. Loving has not provided us with sufficient material to establish that a hearing is warranted or that we should question the broad discretion afforded to the district court in awarding restitution. *See State v. Tenerelli,* 598 N.W.2d 668, 671 (Minn.1999).

We have carefully considered Loving's pro se claims and conclude that they are without merit.

Affirmed.