*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0649**

State of Minnesota,
Respondent,

vs.

Steve Vang,
Appellant.

**Filed April 15, 2024**
**Affirmed**
**Bratvold, Judge**

Ramsey County District Court
File No. 62-CR-20-2726

Keith Ellison, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Alexandra Meyer, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota; and

Paul J. Maravigli, Special Assistant Public Defender, Minneapolis, Minnesota (for appellant)

Considered and decided by Connolly, Presiding Judge; Smith, Tracy M., Judge; and Bratvold, Judge.

**NONPRECEDENTIAL OPINION**

**BRATVOLD**, Judge

Appellant's trial included testimony that appellant pointed a gun at his former girlfriend in a grocery-store parking lot. In this direct appeal, appellant challenges two of

his four convictions stemming from that incident, arguing that the evidence was insufficient to sustain his convictions for second-degree assault and unlawful possession of a firearm and that the district court abused its discretion by admitting relationship evidence. Appellant relies heavily on a surveillance video recording of the incident. We conclude that the record evidence is sufficient to prove that appellant had a gun during the incident. We also conclude that the district court did not abuse its discretion when it admitted relationship evidence about appellant and his former girlfriend. Thus, we affirm.

**FACTS**

Respondent State of Minnesota charged appellant Steve Vang with four counts related to events on April 8, 2020, that involved his former girlfriend S.Y.: (1) second-degree assault under Minn. Stat. § 609.222, subd. 1 (2018); (2) threats of violence under Minn. Stat. § 609.713, subd. 1 (2018); (3) gross-misdemeanor violation of an order for protection (OFP) under Minn. Stat. § 518B.01, subd. 14I (2018); and (4) unlawful possession of a firearm under Minn. Stat. § 624.713, subd. 1(2) (2018).

Before trial, Vang filed a motion in limine to "suppress[] evidence regarding [his] criminal history and/or prior bad acts," among other things. The state moved to admit evidence "of similar conduct" by Vang against S.Y. under Minn. Stat. § 634.20 (2022) and "evidence regarding the history of the relationship" between Vang and S.Y.

In a written order, the district court granted in part and denied in part Vang's motion in limine. The district court explained that "[c]ertain portions of Mr. Vang's criminal history will be excluded from testimony during trial, including the named charges on which he was convicted and any reference to time he spent in prison."

2

Vang's jury trial began in December 2022. The state offered testimony from S.Y., her sister, and an officer who responded to the scene. Before S.Y. testified about what happened on April 8, 2020, she offered testimony about her relationship with Vang.[1]

S.Y. testified that she and Vang dated from 2013 to 2017. In 2015, while they were living together, S.Y. told Vang she wanted to break up. Vang "didn't take it well" and threatened S.Y. "with a knife" and would not let her "out of the room to leave." On another occasion, Vang "block[ed] the door[,] . . . holding [S.Y.] back" and "grabbing [her] arm." Vang took S.Y.'s phone away. S.Y. received "bruise[s]" during the relationship. Vang also talked about having a gun and threatened S.Y. with it, though she never saw Vang with a gun. Vang threatened to harm S.Y. and her family if she "called the police."

Vang moved away in 2017, and S.Y. moved in with her brother; yet S.Y. was "still in contact" with Vang. Vang returned in 2019, and S.Y. told him she "didn't want to be with him anymore." Vang then started "stalking" and "harassing" S.Y. In December 2019, S.Y. obtained an OFP that prohibited Vang from having "any contact" with S.Y. for two years.

---

[1] Before S.Y.'s testimony and during the final jury instructions, the district court gave a limiting instruction about the jury's use of the evidence of Vang's relationship with S.Y. The district court did not give a limiting instruction before S.Y.'s sister testified that S.Y. told her about an argument with Vang in which "he was upset, so he was holding a knife at that time." While Vang's brief to this court notes that no limiting instruction was given before S.Y.'s sister's testimony, it does not contend that the failure to give a limiting instruction was an abuse of discretion. The record shows that, after S.Y.'s sister's testimony and outside the presence of the jury, the parties discussed the lack of a limiting instruction during the sister's testimony. Vang's attorney stated that, "instead of drawing additional attention to" the relationship evidence the sister offered, she "was fine not having an interruption after sort of that moment had passed."

On April 8, 2020, the date of the incident giving rise to the charges in this case, S.Y. drove a black Chevy Tahoe sport utility vehicle (SUV) to a grocery store in St. Paul. S.Y.'s sister was in the front passenger seat, and S.Y.'s eight-year-old daughter was in the back seat. As S.Y. pulled into the grocery-store parking lot, she saw Vang's tan Honda Pilot SUV. S.Y. told her sister to stay inside the car.

According to S.Y., while S.Y. remained in her SUV, Vang parked nearby and then "ran up to" her driver-side window. Vang "pound[ed] on the window" and asked S.Y. what she was doing. He tried to open S.Y.'s door, but it was locked. S.Y. told "him to leave or to stop" and that she was "going to call the police." Vang "pulled out his gun" and pointed it at the driver-side window, stating that, if S.Y. called the police, "he was going to shoot." The gun was a black and "silver or gray" handgun.

Vang moved the gun "back and forth from his jacket and then to the window," pointing it at S.Y. and then putting the gun "back in his jacket." S.Y. started to back her SUV up, then stopped because Vang "pointed the gun" and "was threatening to shoot." Although other people passed by in the parking lot, no one appeared to engage with either Vang or S.Y. Vang "got in his car" and "left." S.Y. called 911 to report the incident.

S.Y.'s sister also testified about the same events. S.Y.'s sister testified that when they arrived at the grocery-store parking lot, she "opened [her] door to step out" of the car, but S.Y. "told [her] to come back in" because S.Y. "saw her ex-boyfriend." Vang "came out of his car," started "knocking on [S.Y.'s] window, car door, for her to open up," and was "pulling on the door." S.Y. and Vang were "yelling at each other." S.Y. told Vang "to go away" and that she was going "to call the police." Vang took out "a gun at that time and

4

pointed it at [S.Y.] and said, if you do, then I'll kill you." More than once, Vang put his gun back in his jacket and then took it out again. S.Y. told her sister to call 911. Vang "left back to his car," and S.Y.'s sister "hung up."

The state also offered into evidence a surveillance video recording of the grocery-store parking lot and audio recordings of S.Y.'s 911 call and S.Y.'s and her sister's interviews with police a few days after the April 2020 incident. No gun is visible in the surveillance video, and no gun was recovered or introduced at trial.

Vang did not testify or call any witnesses. The jury returned guilty verdicts on all four charges. The district court sentenced Vang to concurrent sentences of 51 and 60 months in prison for second-degree assault and unlawful possession of a firearm, respectively.

Vang appeals.

## DECISION

In his brief to this court, Vang raises two issues. First, Vang argues that his "convictions for second-degree assault and prohibited person in possession of a firearm must be reversed" based on insufficient evidence that he "possessed a gun at the time of the incident." Second, Vang contends that the district court abused its discretion "when it allowed the state to introduce relationship evidence." Vang does not appeal his convictions for threats of violence and violating an OFP. We address Vang's two issues in turn.

**I.** **The evidence is sufficient to sustain Vang's convictions for second-degree assault and unlawful possession of a firearm.**

When considering a challenge to the sufficiency of the evidence, appellate courts "conduct a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Hohenwald*, 815 N.W.2d 823, 832 (Minn. 2012) (quotation omitted). This is "the traditional standard of review, which applies whenever the direct evidence establishing a particular element of a crime is alone sufficient to support the jury verdict." *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017). Under this standard of review, appellate courts must "assume that the jury believed the state's witnesses and disbelieved contrary evidence." *State v. Brocks*, 587 N.W.2d 37, 42 (Minn. 1998). Appellate courts will not disturb a guilty verdict where "the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that the defendant was proven guilty of the offense charged." *State v. Flowers*, 788 N.W.2d 120, 133 (Minn. 2010) (quotation omitted).

The state bears the burden "of proving beyond a reasonable doubt every element of a charged offense in a criminal trial." *State v. Pakhnyuk*, 926 N.W.2d 914, 919 (Minn. 2019). To prove Vang's guilt of second-degree assault, the state was required to prove that Vang assaulted S.Y. with a dangerous weapon. Minn. Stat. § 609.222, subd. 1; *State v. Nyagwoka*, 894 N.W.2d 174, 177 (Minn. App. 2017). A firearm is a dangerous weapon. Minn. Stat. § 609.02, subd. 6 (2018). To prove Vang's guilt of unlawful possession of a

firearm, the state was required to prove that Vang knowingly possessed a firearm when he was ineligible to do so. Minn. Stat. § 624.713, subd. 1(2); *State v. Harris*, 895 N.W.2d 592, 601 (Minn. 2017). Here, Vang stipulated that he was ineligible to possess a firearm. Thus, on appeal, the only disputed element for both of Vang's challenged convictions is whether Vang knowingly possessed a firearm during the April 2020 incident.

Vang urges this court to reverse both challenged convictions because "the state failed to prove beyond a reasonable doubt that [he] possessed a gun at the time of the incident." The state argues that it "presented evidence that [Vang] possessed a firearm through direct evidence from two eyewitnesses" and that this court should defer to the "jury's determination that the eyewitness testimony was credible."

Vang argues that the evidence was insufficient for three reasons. First, Vang contends that "S.Y.'s description of the alleged gun at the scene differed markedly from her description at trial." We disagree with Vang's summary of the record evidence. S.Y. testified that, during the April 2020 incident, Vang had a "handgun" and "the bottom part was black and the top part was silver or gray." In the recording from S.Y.'s 911 call, S.Y. stated that Vang had "a small handgun" that was "gray/black." The responding officer who spoke with S.Y. in the grocery-store parking lot testified that S.Y. described Vang's gun as a "[s]mall black handgun." Thus, the record evidence fails to show that S.Y.'s testimony about the gun "differed markedly."

Even if we assume that S.Y. gave inconsistent descriptions of the gun, we defer to the jury to assess witness credibility. *State v. Barshaw*, 879 N.W.2d 356, 366 (Minn. 2016); *State v. Reichenberger*, 182 N.W.2d 692, 695 (Minn. 1970) ("The witness did make some

7

prior statements which were not consistent with her testimony at trial. The jury was apprised of those facts, however, and the task of weighing credibility was for the jury, not this court."). Because the jury found Vang guilty, this court must assume that the jury believed S.Y.'s testimony. *See Brocks*, 587 N.W.2d at 42. We defer to the jury's credibility determinations, and thus, Vang's claim of inconsistencies in S.Y.'s description of the gun does not provide a basis for reversal.

Second, Vang argues that the surveillance video recording from the grocery-store parking lot "does not show [Vang] waving or pointing a gun" and shows a "strange lack of reaction" from bystanders and that "[n]o gun is ever recovered from Mr. Vang when he was arrested, nor as part of any related search." Vang appears to argue that the state needed to corroborate S.Y.'s and her sister's testimony that Vang had a gun. A conviction, however, can rest on "the uncorroborated testimony of a single credible witness." *State v. Foreman*, 680 N.W.2d 536, 539 (Minn. 2004) (quotation omitted). For example, in *Foreman*, the district court convicted Foreman of second-degree assault for pointing a gun at his wife during an argument. *Id.* at 537. The Minnesota Supreme Court rejected Foreman's sufficiency-of-the-evidence challenge after determining that the wife's "positive and uncontradicted testimony provided sufficient evidence to support the conviction." *Id.* at 539.

Here, S.Y.'s and her sister's testimony about Vang pointing a gun at S.Y. were "positive and uncontradicted," as was the wife's testimony in *Foreman*. *Id.* Although no gun is visible on the surveillance video, the recording depicts Vang from behind and at a distance and a light pole obstructs the camera's view of Vang some of the time. Also,

8

Vang's hands are not clearly visible in the recording, which shows Vang raising his right arm to the driver-side window of S.Y.'s SUV. And contrary to Vang's contention that there was a "strange lack of reaction" from bystanders, the recording shows a bystander who appears to have been watching the exchange between S.Y. and Vang. As a result, we reject Vang's claim that the recording is inconsistent with S.Y.'s and her sister's testimony that Vang pointed a gun at S.Y.

Further, although corroboration is not needed, S.Y.'s testimony that Vang had a gun was corroborated by S.Y.'s 911 call and her sister's testimony. Thus, the evidence, viewed in a light favorable to the verdict, supports the jury's determination that Vang possessed a gun during the incident.

Third, Vang argues that reversal is warranted based on "insufficient credible testimony from the accusing witnesses," as in *State v. Langteau*, 268 N.W.2d 76 (Minn. 1978). In *Langteau*, the alleged victim testified that, "at about midnight as he was returning to the St. Paul YMCA from St. Joseph's Hospital, where he had been visiting a friend, he was robbed at gunpoint" by Langteau. 268 N.W.2d at 77. Langteau testified and "categorically denied any involvement in the crime." *Id.* On appeal, the supreme court described the record evidence: "[N]othing was discovered to link [Langteau] with the crime," and "[t]he reason why [Langteau] would have held up [the alleged victim], with whom he was well acquainted, is left a mystery." *Id.* Accordingly, the supreme court reversed and remanded for a new trial "in the interests of justice." *Id.*

This case is distinguishable from *Langteau* in three ways. First, unlike the uncorroborated testimony of the alleged victim in *Langteau*, S.Y.'s testimony was

corroborated. Second, S.Y.'s testimony does not contain unexplained details, as did the victim's testimony in *Langteau*. *See Foreman*, 680 N.W.2d at 539 (distinguishing *Langteau* because, in that case, "the actions by the victim were questionable or unexplained"). Third, as compared to *Langteau*, in which Langteau's motive was "a mystery," S.Y.'s testimony about their breakup and Vang's subsequent stalking and harassing behavior suggested a motive for the confrontation on April 8, 2020. 268 N.W.2d at 77.

In sum, the record evidence, viewed in a light favorable to the verdict, shows that Vang possessed a gun during the April 2020 incident and thus sustains Vang's convictions for second-degree assault and unlawful possession of a firearm.

## II. The district court did not abuse its discretion by admitting evidence about Vang's relationship with S.Y.

Vang's brief to this court argues that "the district court committed reversible error when it allowed the state to introduce relationship evidence." "The term 'relationship evidence' has generally been used to describe any evidence that is offered to illuminate the relationship between the accused and the alleged victim." *State v. Bell*, 719 N.W.2d 635, 638 n.4 (Minn. 2006).

Minnesota law provides for the admission of relationship evidence "unless the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Minn. Stat. § 634.20; *accord State v. McCoy*, 682 N.W.2d 153, 161 (Minn. 2004) (adopting Minn. Stat. § 634.20 as a rule of

10

evidence). The supreme court has also held that "[c]onsistent with Minn. R. Evid. 404(b), relationship evidence is character evidence that may be offered to show the strained relationship between the accused and the victim and is relevant to establishing motive and intent." *State v. Loving*, 775 N.W.2d 872, 880 (Minn. 2009) (quotation omitted).

Appellate courts review a district court's decision to admit relationship evidence for an abuse of discretion. *Id.* at 879. An appellant must show that the district court erred in admitting relationship evidence and that "there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Benton*, 858 N.W.2d 535, 541 (Minn. 2015) (quotation omitted).

Vang challenges the district court's admission of relationship evidence offered through the testimony of S.Y. and her sister, raising three grounds that we address in turn. First, Vang argues that the relationship evidence "was not required or helpful in order to assist the State in proving an element of the offense, or to bolster the credibility" of S.Y. The state responds that the relationship evidence "assisted the jury in understanding the charged conduct in context and in making credibility determinations." The state also contends that its case "rested entirely on [the] credibility" of S.Y. and her sister and that Vang "attacked the credibility of S.Y. repeatedly."

We agree with the state. The district court did not explain its reasoning for admitting the relationship evidence offered by the state. But the supreme court has held that relationship evidence "may be offered to illuminate the history of the relationship" between the accused and the alleged victim and "put the crime charged in the context of the relationship." *McCoy*, 682 N.W.2d at 159 (discussing Minn. Stat. § 634.20). Relationship

evidence may "assist[] the jury by providing a context with which it could better judge the credibility of the principals in the relationship." *Id.* at 161.

At trial, Vang's attorney tried to discredit S.Y. by pointing out "inconsistenc[ies]" in her testimony and arguing that it differed from her statements to police about the April 2020 incident. Evidence of Vang's threats toward S.Y, violent behavior, and stalking, both during and after their relationship, helped the jury assess S.Y.'s credibility. *See, e.g.*, *State v. Lindsey*, 755 N.W.2d 752, 757 (Minn. App. 2008) (determining that relationship evidence "had significant probative value in assisting the jury to judge witness credibility"), *rev. denied* (Minn. Oct. 29, 2008). The relationship evidence also helped the jury understand the April 2020 incident in the context of Vang and S.Y.'s entire relationship. *See id.* at 756 (stating that evidence that places an event in context of the relationship between the victim and the defendant "bolsters its probative value" (quotation omitted)).

Second, Vang argues that "[t]he relationship evidence in this case lacked any specific time frame," relying on *State v. Hormann*, 805 N.W.2d 883 (Minn. App. 2011), *rev. denied* (Minn. Jan. 17, 2012). The state argues that *Hormann* is distinguishable.

We consider the facts in *Hormann*, in which the state charged Hormann with stalking his wife and using a tracking device on her vehicle. 805 N.W.2d at 886. At trial, when asked to describe her marriage to Hormann, the wife testified:

> [T]here was a lot of fighting . . . . [T]here was a lot of violence. [Hormann] gets very angry. He's very controlling. He controlled all the money . . . . Literally every door in the house had a hole in it or had been broken. There [were] holes in the wall. He drove his pickup through the back end of the

12

garage because he was mad. I've had several bruises. I've been pushed up against the wall many times. I've been pushed, I've been shoved, I've been spit on, I've had beer poured on me . . . .

*Id.* at 886-87. On appeal, this court described the wife's testimony about her marriage as "devoid of detail as to time, place, circumstance, or context" and determined that her "open-ended and narrative testimony had little apparent value other than to establish [Hormann's] bad character and was unnecessary" based on the wife's other "specific-incident testimony." *Id.* at 891. We concluded that the district court abused its discretion by admitting the wife's testimony about her marriage, but we determined that the error was harmless. *Id.* at 891-92.

*Hormann* does not affect our analysis of the relationship evidence. In *Hormann*, we did not consider the admissibility of the wife's testimony under section 634.20.[2] *Id.* Here, S.Y.'s testimony was admissible under section 634.20. Also, the wife's testimony in *Hormann* was more general than S.Y.'s testimony, so the probative value of S.Y.'s testimony was higher. For example, S.Y. testified that, when she was living with Vang in 2015, she told him that she was thinking of ending the relationship and Vang "didn't take it well," "threat[ened S.Y.] with a knife," and did not let her "out of the room to leave." S.Y. also testified that, in 2019, after she broke up with Vang, he "wanted to make things work," but she "kept telling him no," so Vang would "drive by" her house, "sit outside and

---

[2] This court explained in *Hormann* that the district court did not consider section 634.20 as a basis for admitting the wife's testimony about her marriage because the state did "not contend that stalking or the illegal use of a tracking device, as defined, constitutes domestic abuse." *Id.* at 890.

13

wait [to] see when [she] was going to come out[,] . . . stop by [her] workplace," and "leave messages" telling S.Y. "to open the door" or else "he would climb into [her] house and break a window" or "beat [her] up with his gun." Thus, *Hormann* does not persuade us that the district court abused its discretion by admitting relationship evidence.

Vang's third point contends that the district court erred by failing to weigh the probative value of the evidence against the danger of unfair prejudice. The state asserts that the absence of explicit reasoning is not error, arguing that "no caselaw requires the district court to do so, let alone makes admission without such a record reversible error." Indeed, the supreme court has held that "admission of relationship evidence was not error, despite the fact that the trial court did not, on the record, engage in the probative value versus potential prejudice balancing test." *Bell*, 719 N.W.2d at 640 (citing *State v. Lee*, 645 N.W.2d 459, 467 (Minn. 2002)).

In *State v. O'Meara*, "the district court did not make an express finding on probative value versus prejudicial impact" of admitting relationship evidence. 755 N.W.2d 29, 33 (Minn. App. 2008). We noted, however, that the district court expressly recognized that "[t]he legislature has clearly provided that this type of evidence in romantic relationships is admissible even though it's prejudicial to a defendant." *Id.* In *O'Meara*, we determined that the district court's "fail[ure] to more explicitly address the balancing test on the record" was "not erroneous." *Id.* Similarly, we conclude here that the district court did not err by failing to explicitly weigh the probative value of the relationship evidence against its potential for unfair prejudice.

14

Because we conclude that the district court did not abuse its discretion by allowing the state to offer evidence of Vang's relationship with S.Y., we need not consider Vang's arguments about prejudice.

**Affirmed.**